## Wytheville.

## ATLANTIC COAST LINE RAILROAD COMPANY v. TREDWAY'S ADMINISTRATRIX.

June 14, 1917.

Absent, Burks, J.*

1. FEDERAL EMPLOYERS' LIABILITY ACT—*Employer and Employee.*— Defendant's railroad tracks were crossed by those of the Southern Railway. In consideration of the privilege of crossing, and in accordance with section 1294-d (37), Code of 1904, the Southern Railway agreed to provide at its cost "such watchman, watch boxes, signals, approaches, and safe guards" as its manager or superintendent might deem proper and necessary. In compliance with this agreement, the Southern Railway erected at the crossing a signal tower and it assumed the duty of supplying and paying the operators in the tower and also the employees who lit the lamps required for the proper operation of the interlocking plant by night. The employees rendered certain services to defendant, among others keeping certain lights in order, which served as signals for defendant's trains only and not for those of the Southern Railway Company. Plaintiff's intestate was one of the operators of the signals and it was also his duty to keep one of the defendant's signal lights aforesaid in order; and while engaged in his duty of attending to this light was killed through the negligence of the defendant.

   *Held:* That plaintiff's intestate was an employee of defendant, within the meaning of that term as used in the Federal employers' liability act.

2. FEDERAL EMPLOYERS' LIABILITY ACT—*Meaning of Terms "Employed" and "Employee."*—The failure of the Congress to define the meaning of the words "employed" and "employee" manifests a purpose in the legislation in question that these words should be interpreted and understood in their ordinary sense and according to their usage in the law of master and servant. That is to say, the relationship of employer and employee is the same as that of master and servant.

---

*Case submitted before Judge Burks took his seat.

3.  MASTER AND SERVANT—*Relationship of Master and Servant.*—At common law, upon the question of whether the relationship of master and servant exists, there are four elements which are considered: (1) Selection and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant's action. Where all of these elements co-exist in one person alone, that person is without doubt the master of the person engaged.

4.  MASTER AND SERVANT—*Relationship of Master and Servant—Non-Assignable Duties.*—Where the duties of the master are non-assignable, the power of control of the servant's action is not the ultimate fact which determines the relationship of master and servant. The ultimate facts are, was the person in question engaged in the discharge of the duties of a servant of another, and was that service accepted by that other—was such service rendered and accepted? If so, the law implies the contract of master and servant between the latter and the former—of employer and employee—and the existence of that relationship between them.

5.  MASTER AND SERVANT—*Relationship of Master and Servant—Non-Assignable Duties—Carrier.*—And were the service not accepted as that of a servant, and, by express agreement or otherwise, the master were to attempt to escape responsibility by relinquishing control of the servant—where the duty is non-assignable—the master can not escape the duty resting upon him by relinquishment of control of the servant, or by otherwise making it impossible for himself to perform the duty. And the duty is non-assignable when it pertains to the operation of a completed railway of a common carrier.

6.  MASTER AND SERVANT—*General and Special Master.*—A servant may be transferred from his service for one master—who may have made the express contract of employment of the servant and may pay the latter his wages, and be his general master—to the service of another person other than his general master; in which case—(1) The special master is alone liable to third persons for injuries caused by such acts as the special servant may commit in the course of his employment; (2) the special servant must look to the special master for his indemnity, if he is injured, while the stipulated work is in progress, by dangerous conditions resulting from the special master's failure to fulfil one of those duties which the law imposes upon masters for the benefit and protection of their servants.

7.  MASTER AND SERVANT—*Non-Assignable Duties—Carriers.*—The duties of the plaintiff's intestate in tending signals and lights of defendant were non-assignable duties.

8.  Railroads—*Negligence—Master and Servant—Disregarding Signal.*—Plaintiff's intestate, a signalman, after he had set a stop signal against a train, was struck and killed by such train, which disregarded the signal while he was tending another light.  The stop signal was plainly visible to the engineer of the train.

*Held:* That defendant railroad was guilty of negligence.

Error to a judgment of the Circuit Court of Greensville county, in an action of trespass on the case.  Judgment for the plaintiff.  Defendant assigns error.

*Affirmed.*

*Wm. B. McIlwaine* and *Wm. Leigh Williams,* for the plaintiff in error.

*Buford & Peterson* and *Southall & Turner,* for the defendant in error.

Statement of the Case and Facts, By Sims, J.

The plaintiff in error was the defendant in the court below, hereinafter designated "defendant." The defendant in error was the plaintiff in the court below, hereinafter designated "plaintiff."

The action was brought under the Federal employers' liability act and involves only two questions, namely:

1. Whether the plaintiff's intestate was an "employee" of the defendant, within the meaning of the Federal employers' liability act approved April 22, 1908, at the time of receiving his injuries?

2. Whether said injuries and death were due wholly or in part, to the negligence of the defendant.

The trial in the court below resulted in a verdict and judgment for the plaintiff. Considering the evidence, under

93

the rule applicable in such cases, the material facts bearing on said questions are as follows:

## FACTS.

1st. With respect to whether the plaintiff's intestate was an employee of the defendant at the time of receiving his injuries.

The accident occurred in the town of Emporia at a grade crossing of the railroad of the defendant over the railroad of the Southern Railway Company. Defendant's railroad, through its predecessor in title was the senior in location at this point. The Southern Railway, through its predecessor in title, constructed its line of railway across the railway of defendant at Emporia under the terms of an agreement in writing. At the time of the accident the defendant occupied the position of the party of the first part under this agreement and the Southern Railway Company the position of the party of the second part thereunder. The material provisions of such agreement are as follows:

"Second: The construction and material employed in such 'crossing' shall be acceptable to the party of the first part.

"Third: The entire expense of construction and maintenance of the 'crossing' shall be borne by the party of the second part who shall at once make good and pay over to the party of the first part, on demand of their proper officers, the full amount of any expense the party of the first part may incur now, or hereafter, in accommodating their tracks or road bed to the said 'crossing' and shall at all times promptly make such repairs of the same as may be prescribed and demanded by the proper officers of the party of the first part.

"Fifth: The party of the first part shall have the right at any time to construct across the track of the party of the

second part within the limits of forty feet on each side of the center of and measured at right angles to the track of the party of the first part, additional tracks, and it shall be the duty of the party of the second part to provide and maintain the crossings needed therefor in the same manner and to the same extent as in the case of the crossings of the present track of said first party and on like terms and conditions.

"Sixth: It shall be the duty of the said party of the second part at their own exclusive, proper cost to provide and maintain at all times and both by day and by night such watchman, watch boxes, signals, approaches, and safe guards, as may in the opinion of the superintendent or manager of the party of the first part, be proper and necessary for the protection of the trains of the parties to this contract or of those of any party who may at any time use the track of either party and the 'crossing' herein provided for, for the passage of locomotive engines or cars, and the duties of such watchman shall be exclusively those arising out of the management of the 'crossing,' and they shall not be employed by either party for any other purpose whatsoever."

This agreement in effect made the same provisions as the statute in Virginia, section 1294-d (37), Pollard's Code 1904, on the subject, which is as follows:

"(37) Any railroad company heretofore, or that may hereafter, be incorporated, and authorized to construct a railroad within the jurisdiction of this State, shall, when such railroad is constructed to any other railroad track, or the right of way of any other railroad being operated under the laws of this State, have the right to connect with such railroad in any county of this State at its own cost, at any suitable point that may be agreed upon between the chief engineers of the two railroad companies, and if the said engineers shall fail to agree, the State Corporation Commis-

sion may, after hearing evidence decide the question in dispute and enter the proper order. But such connection, if made, and all costs and expenses of such operation and maintenance of such connection, including signals and other things deemed necessary by the company with which said connection is made, for the proper operation and protection thereof, shall be borne and paid by the company making such connection."

Subsequently to said agreement it became necessary for the defendant to double-track its road, which was accordingly done, through Emporia, and the Southern Railway Company in accordance with its agreement bore the expense of the construction, at said crossing, of a signal tower, together with various levers and devices for signalling trains and for the operation thereof, known as an "interlocking plant," and assumed the duty of supplying and paying the operators in the tower and also the employees who lit the lamps required for the proper operation of the interlocking plant by night. (Certain automatic electric devices operating in connection with the signals aforesaid were installed in said signal tower and in connection therewith by the defendant, at its own expense; but as this circumstance is immaterial in the view we take of the case, no detailed reference need be made thereto).

The Southern Railway Company employed (in the sense of making contract of employment with), paid, and had the right to discharge the employees referred to.

By virtue of the said agreement and also of the said statute on the subject the defendant furnished to the Southern Railway Company the consideration—viz. the privilege of crossing its track—for the payment by the latter of the wages of said employees, and for its assumption of the primary administrative duties of engaging and discharging said employees.

The employees, however, rendered certain services for the defendant in and about the signalling of its trains passing to and fro over said crossing, as well as like services for the Southern Railway Company in and about the signalling of its trains passing to and fro over such crossing. For example, and in particular, as bearing on the instant case, such employees served the defendant in answering the signals of its trains, and in turn responding to such signals by themselves giving signals permitting or forbidding the passage of defendant's trains, and also served the defendant in the keeping of certain lights in order, which served as signals for defendant's trains only and not for those of the Southern Railway Company.

Among the lights last above named was dwarf signal light No. 4, located on the defendant's right of way, close beside its track south of the signal tower and crossing. This dwarf light No. 4 was not used for signalling any of the Southern Railway Company trains, but solely for signalling the trains running on defendant's road.

The plaintiff's intestate was one of the operators of the signals from the aforesaid signal tower and it was also his duty to keep the dwarf signal light No. 4 in order. He was in effect employed (in the sense of contracted with) and paid, by the Southern Railway Company. (There were certain details as to how he came to undertake the duty of keeping said dwarf signal light No. 4 in order, which are immaterial, and hence need not be set out here.) The Southern Railway Company also had the authority to discharge the plaintiff's intestate.

2. With respect to whether the injuries and death of the plaintiff's intestate were due, wholly or in part, to the negligence of the defendant, the facts were as follows:

There was a high signal post by the side of the defendant's railway, 442 feet to the north of the center of the signal tower, operated therefrom, on which there was dis-

played for some time and immediately before the accident, a stop signal consisting of a red light and a paddle in a horizontal position, by and in disregard of which, and the rules of the company, and of the defendant's duty in that behalf, the south-bound passenger train of defendant ran, which struck and killed the plaintiff's intestate while engaged in his duty of tending said dwarf light No. 4 (fixing, preparatory to relighting it) after he had, as signal operator in the tower, left the stop signal set as aforesaid against the passage of such southbound train and had the right to rely upon it not passing where he was until he had returned to the signal tower and changed said stop signal to one allowing the passage of the train. This occurred about 8:18 or 8:17 P. M. on the 13th day of August, 1915.

The headlight of the engine of the said train going south made the position of the paddle at the signal post aforesaid plainly visible to the engineer of such train. The red light was also plainly visible at the hour named to such engineer.

The light of the stop signal aforesaid, whether red or white, could not be seen from the signal tower, as it was not constructed or intended, when set as it was, to shine in that direction, but the testimony for plaintiff, with regard to the stop signal being set as aforesaid against said southbound train, was definite and positive, and consisted of the statement of an eyewitness as to what was the action of the plaintiff's intestate and his statements *dum fervet opus*, in connection with such action, in the signal tower immediately preceding the leaving the tower by the latter to go to fix the dwarf light No. 4. It is true there was testimony for defendant (four witnesses) in direct conflict on this point with the one witness for the plaintiff and there was some inaccuracy in the testimony of plaintiff's witness with respect to the number of one of the levers in the signal tower; but all this went merely to the accuracy and credibility of this witness and was for the jury. We cannot

enter upon that inquiry and the fact must be taken by us to be that the red signal—the stop signal—was set as aforesaid.

The agreement in the evidence was abrogated at a date subsequent to the accident aforesaid, and the defendant is now exercising the right of direct employment, supervision and control of the employees discharging the duties formerly discharged by plaintiff's intestate.

## The Assignments of Error.

There are two assignments of error: First, with respect to the giving, refusing and modifying of certain instructions by the court below; and, secondly, to the action of such court in refusing to set aside the verdict of the jury on the motion of the defendant and grant it a new trial. (The ground assigned in the petition with respect to the verdict being excessive was not pressed in the argument and is untenable under the well settled rules on the subject.)

Sims, J., after making the foregoing statement, delivered the opinion of the court.

As indicated above, the assignments of error raise only two questions for our determination, which will be considered in their order as stated below:

1. Was the plaintiff's intestate an "employee" of the defendant, or in its employment, within the meaning of the Federal employers' liability act approved April 22, 1908, at the time of receiving his injuries?

The Federal act in question does not itself define the meaning of the word "employee" or the word "employed" also used in the act.

That portion of such act, which is pertinent to the question under consideration, is as follows:

\* \* \* "every common carrier by railroad \* \* \* shall be liable in damages to any person suffering injury while he is employed by such carrier \* \* \* or in case of the death of such employee, to his \* \* \* personal representative."

The learning and exhaustive search of able counsel on both sides of this case have not resulted in citing us to any decision or discussion by any text-writer of the meaning of these terms as employed in such act. The precise question before us seems, therefore, to be a novel one both in our Federal and State courts.

The word "employed," and more especially the word "employee," considered apart from their context in the Federal act, are ambiguous in their meaning. They may be limited in meaning by the idea that an express contract of hiring by the carrier of and the payment of wages by the latter to the employee, are essential to bring him within the provisions of the act. Or they may have a broader meaning and include as employees all who are engaged in the discharge of duties of servants of the carrier, whose service is knowingly accepted by the latter.

On a collateral question it has been held that, the failure of the Congress to define the meaning of the words referred to above manifests a purpose in the legislation in question that these words should be interpreted and understood in their ordinary sense and according to their usage in the law of master and servant. *Louisville etc., Co.* v. *Walker* (1915), 162 Ky. 209, 172 S. W. 517.

That is to say, the relationship of employer and employee is the same as that of master and servant.

In the law of master and servant the principles of the common law determining when this relationship exists, are well settled. At common law, upon the question of whether

the relationship of master and servant exists, there are four elements which are considered: (1) selection and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant's action. Roberts & Wallace, Employers' Liability (4th ed.), p. 78.

But, as the last cited author says, the first, second and third of these elements are not essential to the relationship (*Idem,* p. 79-82). The "power of control" is the most significant element bearing on the question, in the opinion of this author, gathered by him from the authorities. (*Idem,* p. 85, 88, 87. See also note 37 L. R. A., pp. 38-43). As said in the case of *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, 53 L. Ed. 480, 29 S. Ct. 252, "In many of the cases the power of substitution or discharge, the payment of wages, and the circumstances bearing upon the relation, are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and where is the power of control.". Many of the authorities emphasize the importance of locating in what person resides the power of control, as a test for ascertaining whether one occupies the relationship of master to another. See English and American authorities collated in note to 37 L. R. A. pp. 38-39; *Tompkins* v. *Pacific Mut. Life Ins. Co.,* 53 W. Va. 479-492, 44 S. E. 439; *Singer Mfg. Co.* v. *Rahn,* 132 U. S. 518-523, 33 L. Ed. 440, 10 Sup. Ct. 175. Some of these authorities are to the effect that control of the manner in which the details of the work are to be done is the test; but this is not a dependable test. *Standard Oil Co.* v. *Anderson, supra.* The control over the work of the servant may be divided. The master may, for reasons of his own, delegate the immediate direction and control of his servant to another and still reserve the ultimate power of control. (*Standard Oil Co.* v. *Anderson, supra.*) Whether the ultimate power of control is express,

94

or is in one form or in another, is manifestly immaterial. But, after all, such questions concern only the fact of control. Is this the ultimate fact to be sought in our inquiry? Manifestly not, where the duties of the servant are non-assignable. If the master could escape liability for the torts of his servants, or for negligent injuries to them, by surrendering his power of control over them, in a qualified way (as was done by the agreement in evidence in the instant case), or by entirely surrendering such control, he might do so. Yet, plainly, in the case of non-assignable duties, the inquiry would still remain, in every case of tort or injury aforesaid, did the relationship of master and servant in fact exist? If so, the duties imposed by law upon the master as the result of that relationship would remain, independent of the fact in whom the immediate or ultimate power of control of the servant might reside.

The defendant had the power of control in question originally. It need not have parted with it. If by the agreement in evidence it did part with it, partly or wholly, it could not thereby divest itself of the legal responsibility it was under to exercise such control. It is indeed illogical and unsound in principle to make the possession of the power of control of a servant the test in the ascertainment of who is the master of such servant, in cases where the duties of the latter are non-assignable. In truth it follows rather from the relationship of master and servant—from the mutual duties and obligations which the law imposes as the result of such relationship—that the master has the right of control of the servant, than does the relationship follow from the existence of the power of control. The latter may, indeed, and does in fact almost invariably accompany the former; but it accomplishes it as an effect and not as a cause. Again, it may not invariably accompany the relationship, as we have seen. This consideration alone, con-

demns it as a test of the existence of the relationship in
question.

Therefore, while we have not found it elsewhere so ex-
pressed in terms, the authorities on the subject have de-
veloped and led us to the necessary conclusion, where the
duties of the master are non-assignable, that control is not
the ultimate fact for which we are in search. The ultimate
facts are, was the person in question engaged in the dis-
charge of the duties of a servant of another, and was that
service accepted by that other—was such service rendered
and accepted? If so, the law implies the contract of master
and servant between the latter and the former—of employer
and employee—and the existence of that relationship be-
tween them. We are aware that many authorities give no
weight to the rendition of the service and predicate the
conclusion that one is or is not the master upon the four
elements above referred to being present or absent in the
conduct of the latter. The effect which a knowing accept-
ance of the service must have, in principle, is often over-
looked.

Further: Were the service not accepted as that of a
servant, and, by express agreement or otherwise, the mas-
ter were to attempt to escape responsibility by relinquish-
ing control of the servant—where the duty is non-assign-
able—the master cannot escape the duty resting upon him
by relinquishment of control of the servant, or by otherwise
making it impossible for himself to perform the duty.
(*Lucas* v. *Mason,* L. R. 10 Ex. 251-3; *Hardaker* v. *Idle Dis-
trict Counil* [1896], 1 Q. B. at p. 340, per Lindley L. J.;
*Dalton* v. *Angus,* 6 App. Cas. at p. 829.) And the duty is
non-assignable when it pertains to the operation of a com-
pleted railway of a common carrier. (See authorities col-
lated in note to 66 L. R. A. pp. 140-2; *Boucher* v. *New York
etc. R. Co.,* 196 Mass. 355, 82 N. E. 15, 13 L. R. A. [N. S.]
1177 and authorities cited in note.)

So in the instant case, the duties of the plaintiff's intestate, (among others) were to operate signals connected with the passage of the trains of defendant and to keep a certain light, which served exclusively the operation of certain of defendant's trains. They were in their very nature duties necessarily to be performed by some one for the defendant, to enable the latter to discharge its public service duties as a common carrier—its public employment under its franchise. *Central &c. Co.* v. *Pullman Co.*, 139 U. S. 24, 35 L. Ed. 55, 11 Sup. Ct. 478, and authorities next above cited. They were therefore duties of the defendant and not of the Southern Railway Company, or of any other person or corporation. Their discharge was the discharge of duties of a servant to the defendant. That service by the plaintiff's intestate was knowingly accepted by the defendant. Hence, upon the established principles of the common law, the plaintiff's intestate was a servant—an employee—of the defendant.

If it were thought that ultimate power of control—and, indeed, the selection and engagement of the plaintiff's intestate, the power of dismissal and the payment of his wages, were essential to his relationship to the defendant being that of an employee—all of these elements will be found, on consideration, present and possessed by the defendant in the instant case.

With respect to the ultimate power of control—that was possessed by the defendant through the Southern Railway Company. If the latter had supplied an inefficient servant for the discharge of the duties of the plaintiff's intestate and had refused to discharge him, it would have been a breach of contract for which the law would have afforded ample remedy to enable the defendant to accomplish the discharge of such a servant and the engagement of a competent servant in his stead. Indeed counsel for defendant, in the trial of the case in the court below, very properly and

correctly stated, in effect, that in case there should be a breach of its duty by the Southern Railway Company to the defendant in the matter of supplying the former with efficient servants in and about the signal tower, the defendant "would find a way" to control the matter.    No absolute right of control of the employees contemplated thereby was vested in the Southern Railway Company by the agreement in evidence, or by the Virginia statute on the subject. *Quoad* the service to be rendered by the employees for the defendant, the agreement imposed the undertaking of the immediate control upon the Southern Railway Company for the benefit of the defendant.    The former was merely the agent of the latter in performing such undertaking, both under said agreement and under the Virginia statute. There was nothing in the Virginia statute which forbade or prevented the defendant from exercising such control directly —as indeed the defendant is now doing, the agreement in evidence having been abrogated since the case at bar arose.    There is nothing in section 1294-b, clause 3 (Pollard's Code of Va. 1904), referred to in reply brief for the defendant inconsistent with the foregoing conclusions. From this it is manifest that while said agreement was in force the Southern Railway Company was merely the agent of the defendant under such agreement to exercise the immediate control of the plaintiff's intestate, with the ultimate power of control remaining vested in the defendant. *Qui facit per alium, facit per se.*

With respect to the selection and engagement of the plaintiff's intestate and the power of dismissal, what is said in the next preceding paragraphs above holds true.

As was said by that eminent judge, Chief Justice Shaw, in the case of *Sproul* v. *Hemmingway,* 14 Pick. (Mass.) 1, 25 Am. Dec. 350, one of the grounds on which persons are held to be employees of owners of "a vessel or coach" is, "in respect to their being engaged in the business or em-

ployment of the owners, conducting and carrying on such business for the profit or pleasure of the owners, by reason of which the acts done in the prosecution of such business shall be taken *civiliter* to be done by the employers themselves, and this whether the persons whose negligence is the cause of damage have been retained and employed by the principal himself, or *by the procuration of others, employed by him for the purpose.*" (Italics supplied.)

And in *Quarman* v. *Barnett*, 6 M. & W. 409, in the opinion of Baron Parke, confirming the opinions of Lord Tenterdon and Littledale, J., it is said:

"Upon the principle *qui facit per alium, facit per se*, the master is responsible for the acts of the servant, and that person is undoubtedly liable who stood in the relation of master to the wrong-doer—he who has selected him as his servant, from the knowledge or belief in his skill and care—and who could remove him for misconduct, and whose orders he was bound to receive and obey; and whether such servant has been appointed by the master directly or *intermediately, through the intervention of an agent authorized by him to appoint servants for him,* can make no difference." (Italics supplied.)    See also Thomp. Neg., sec. 39.

With respect to the payment of wages, they were in effect paid by defendant through its predecessor in title, when the latter furnished the consideration of permitting the crossing, for which the agreement in evidence, and the Virginia statute in such case made and provided, bound the Southern Railway to pay such wages.

Hence we have present as the instant case all four of the elements above referred to which are considered upon the question of whether the relationship of master and servant exists. It is agreed by all of the authorities that "where all of these elements co-exist in one person alone, that person is without doubt the master of the person engaged." (Roberts & Wallace, Employers' Liability [4th ed.] p. 78.)

The following additional references to the authorities will further develop the distinction above taken.

A servant may be transferred from his service for one master—who may have made the express contract of employment of the servant and may pay the latter his wages, and be his general master—to the service of another person other than his general master; in which case—

"(1) The special master is alone liable to third persons for injuries caused by such acts as the special servant may commit in the course of his employment; (2) the special servant must look to the special master for his indemnity, if he is injured, while the stipulated work is in progress, by dangerous conditions resulting from the special master's failure to fulfil one of those duties which the law imposes upon masters for the benefit and protection of their servants." 1 Labatt on Master and Servant (2nd ed.), sec. 52, p. 170. See for same principle *Rourke* v. *White Moss Colliery Co.,* 2 C. P. D. 205.

In *Missouri Pac. R. Co.* v. *Jones,* 75 Tex. 151, 12 S. W. 972, the following is said in the opinion of the court:

"Upon this branch of the case the facts were that appellee (plaintiff) was at the time of and several months prior to the injury at work for appellant in its yards at Fort Worth, Texas. He was employed by Phalling, the yard master, and received his pay from the Texas Pacific Railway Company. Appellee's duties were to stay in the yard and make up trains. The track on which the injury occurred was kept in repair by appellant. The appellant had control of the yard. It had the track on which appellee was injured dug out between the ties about a day before appellee was hurt; holes were opened out above where he was injured, and there were no ties to put in them. The road master was informed of the danger, but the track was left in that condition.

"The facts show that the appellee was the general ser-

vant of the Texas Pacific and the special servant of the appellant. He performed special services for the latter while the general servant of the former, and while so performing this special service he was the servant of appellee at the time.

"There was no proof of an express contract showing the relation of master and servant between appellant and appellee, but the evidence of the service performed by Jones for the Missouri Pacific and the connection between the two companies authorized the inference that this relation did exist.

"In the case of *Railway Co.* v. *Dorsey,* cited in *Gulf* v. *Dorsey,* 66 Texas 148, 152, 18 S. W. 444, the plaintiff was employed to serve the several companies in their respective yards. It was held that he was the servant of the one in which yard he was when at work. In the opinion in that case it is said:

" 'The proof, we think, shows that by virtue of some arrangement, the precise nature of which could not be ascertained, between the Texas Pacific and the Missouri Pacific Companies, it was the duty of the appellee, who received his pay from the former company, to switch and couple and uncouple the cars in the yard of the appellant and on its tracks, over which the appellant had exclusive control, and whose duty it was to keep said track in repair; and that at the time of performing these services for the Missouri Pacific he was injured by reason of its negligence. While engaged in this service for appellant, *with its knowledge* and under its agreement that the appellee should perform such service, he was the servant of the appellant. The inference was authorized that appellant paid the Texas Pacific for his services, which would be tantamount to a payment to him. *The payment* we believe to be *immaterial* under the facts of this case. He had for a long time prior to the injury *worked for the appellant,* and *his labor was accepted*

up to the time of the injury. *Those facts* made appellee *the servant of appellant* in the transaction in which the damage was sustained *by reason of the service performed.*' " (Italics supplied.)

In *Central* v. *Texas,* 32 Fed. 448, it is held that one who assisted a yard master in making up a train was a servant of the receivers operating the road, whether or not the road master directed him to assist in the capacity of a servant or he volunteered to do so—he was held to have *rendered a service* to the receivers *with the acquiescence of their agent*—i. e. his services were *rendered* to them and *knowingly accepted* by the receivers through their agent, and he was entitled to the protection to be accorded a servant from injury due to the receivers' negligence. (Italics supplied.)

See, to same effect, *Thyssen* v. *Davenport Co.,* 134 Iowa, 749, 112 N. W. 177, 13 L. R. A. (N. S.) 572 and note.

In *Floody* v. *Railroad Co.,* 102 Minn. 81, 112 N. W. 875, 1081, 13 L. R. A. (N. S.) 1196, it was held that a railroad company is liable to its servants for the negligence of the employees of a union depot company, whose duty it is to operate the switches and direct the movement of the trains out of the depot yards. "For the occasion the servants of the depot company become the servants of the railroad company."

The court in its opinion said:

"It was *immaterial* to plaintiff that the switchmen were *paid* by the Union Depot Company, and were *under its control* in operating the switches, if for the occasion, the Omaha Company" (the defendant) *"chose to avail itself* of *the services* of that company and its employees for the purpose of taking its train out of the depot." Citing *Wabash &c. R. Co.* v. *Peyton,* 106 Ill. 534, 46 Am. Rep. 705, which is to the same effect. (Italics supplied.)

95

In *McElroy* v. *Nashua etc. R. Corp.*, 4 Cush. (Mass.) 400, 50 Am. Dec. 794, there was a connection by the defendant railroad, with another railroad, under statute. The injury was occasioned by the negligent operation of a switch on defendant's railroad, making such connection, by a servant of the other railroad. The switch itself was also provided by the latter. The defendant was held liable for the negligence of the servant whose duty it was to operate the switches—*i. e.*, the latter was held to be *pro haec vice* the servant of the defendant. Chief Justice Shaw in delivering the opinion of the court said:

"The switch in question in the careless or negligent management of which the damage occurred, was part of the defendant's road * * *; and although provided for and attended by a servant of the Concord Railroad Corporation, and *at their expense,* yet it was still a part of the Nashua and Lowell railroad" (the defendant) "and *it was within the scope of their duty*" (the defendant's) "to see that the switch was rightly constructed, attended and managed" * * * (Italics supplied.)

But counsel for the defendant contend that in the instant case the duties of the plaintiff's intestate were assignable duties and that the Southern Railway Company was an independent contractor with respect to such duties, and, hence, the plaintiff's intestate was its employee, and not the employee of defendant. Upon this inquiry, if the duties in question were assignable, the ascertainment of the possessor of *the control* over the work and the servant, would be decisive as to who was the employer of the servant. As was said by Willis, J., in *Murray* v. *Currie,* 2 C. P. D. 369, with regard to cases where the duty is assignable: "In ascertaining who is liable for the act of a wrong-doer, you must look to the wrong-doer himself, or to the first person in the ascending line who is the employer and has the control over

the work. You cannot go further and make the employer of that person liable. It is upon this principle that the cases rest of *Bibb* v. *N. & W. Ry. Co.*, 87 Va. 711-740, 14 S. E. 163; *Emmerson* v. *Fay*, 94 Va. 60, 26 S. E. 386; *N. & W. Ry. Co.* v. *Stevens*, 97 Va. 631, 34 S. E. 525; *Railroad Co.* v. *Hanning*, 15 Wall. (U. S.) 649-658; *Casement* v. *Brown*, 148 U. S. 615-622, 37 L. Ed. 582, 13 Sup. Ct. 672; and *Chicago, &c. Ry. Co.* v. *Bond*, 240 U. S. 449, 60 L. Ed. p. 735, 36 Sup. Ct. 403, cited and relied on for defendant. They are inapplicable to the instant case for the reason that the duties of the servant in question were of such a character, as above noted, that they could not be assigned by the defendant to an independent contractor so as to release itself from the position of responsibility for their proper discharge. That is to say, the defendant could not abdicate its position of master with regard to the plaintiff's intestate in the instant case, by delegating or assigning its duty of control of such servant to any independent contractor. It is not a case in which the doctrine of independent contractor is applicable. (See authorities collated in note to 66 L. R. A. pp. 119, 136-7, 140-2; *Boucher* v. *New York, &c. R. Co.*, *supra*, 13 L. R. A. (N. S.) 1177 and authorities collated in note thereto.

We conclude therefore that the plaintiff's intestate was an employee of the defendant within the meaning of the said Federal employers' liability act at the time of receiving his injuries.

With respect to the only question remaining for our consideration, namely:

2. Were the injuries and death of the plaintiff's intestate due, wholly or in part, to the negligence of the defendant?

We do not deem it necessary on this question to enter into any detailed discussion of the evidence or reference to the authorities. The result of the evidence when considered

as if on demurrer thereto by the defendant, as we must consider it, is stated above. The authorities on this subject are too well understood to need citation. We can come to no other conclusion from the evidence and the authorities than that the inquiry under consideration must be resolved by us in the affirmative.

For the foregoing reasons we find no error in the judgment complained of and it will be affirmed.

*Affirmed.*