Elisabeth **BYRNE**, Administratrix of the Estate of Joe G. Irby, Deceased,

v.

**PENNSYLVANIA RAILROAD COMPANY.**

Civ. A. No. 16188.

United States District Court
E. D. Pennsylvania.
March 4, 1958.

Richter, Lord & Levy, B. Nathaniel Richter, Philadelphia, Pa., for plaintiff.

Philip Price, Theodore Voorhees, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

This is an action by the administratrix of Joe G. Irby to recover damages for his death. A critical issue in the case was whether at the time he was killed Irby was an employee of the Pennsylvania Railroad, so as to bring the case under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. A separate trial of that issue was had and the jury, answering a written interrogatory, found that he was. The remaining issues were then tried and the jury found upon sufficient evidence that Irby's death was caused by the negligence of the defendant, and awarded damages in the amount of $250,000.

The defendant now moves for judgment under Fed.Rules Civ.Proc. rule 50, 28 U.S.C.A. and in the alternative for a new trial. The defendant concedes that if the jury's finding that Irby was in its employ at the time of his death was proper, the evidence of negligence and damages was sufficient to support the verdict upon these issues. In that event,

it contends that a new trial should be ordered on account of various trial errors.

Irby, a graduate electrical engineer, had been employed by Westinghouse Electric Corporation for a number of years. At the time of his death and for some fourteen months prior thereto he had been working continuously, full time and overtime, on equipment belonging to the Pennsylvania Railroad, at its Wilmington shops, and on the road. It should be noted, however, that this is not the usual "loaned-servant" type of case, in which the employee temporarily passes completely out of the service of one employer into that of another. The plaintiff in this case does not dispute that Irby was at all relevant times in the employ of Westinghouse, but contends that he was also doing work for the Railroad and was in its employ, as well as that of Westinghouse, when he was killed, and the issue was submitted to the jury on the theory of dual employment [1].

█ The principle is well established and was stated by the Court of Appeals for this Circuit in Dickerson v. American Sugar Refining Co., 211 F.2d 200, 203, as follows: " * * * a person may be the servant of two masters, not joint employers, at the same time as to the same act, provided that service to one does not involve an abandonment of service to the other. Such is the case where the employee is transferred to carry on work which is of mutual interest to both of two employers and to effect their common purpose."

█ The courts have pointed out a large number of factors, all of which are proper for consideration in making the ultimate inference as to who a man's employer is. The defendant stresses control of the work and the manner of doing it as the all-important test, and this view is not without support in the language of some opinions of the courts of Pennsylvania and other states. However, upon the question of employment, in cases arising under the Federal Employers' Liability Act, federal, not state, decisions govern.

█ The question of control of the details of an employee's work is, of course, a very important one, and in Shaw v. Monessen Southwestern Ry. Co., 3 Cir., 200 F.2d 841, Judge Goodrich suggested that perhaps it was the strongest consideration of all. But it is perfectly clear that Judge Goodrich did not mean that it was the sole and conclusive test of the relationship, and I find no decision of the federal courts which so holds.

█ The general rule is that "ordinarily no one feature of the relationship of employer and employee is determinative", De Maree v. Pennsylvania Railroad Company, D.C., 147 F.Supp. 656, 659. Thus in the Shaw case, supra [200 F.2d 843], Judge Goodrich pointed out in a footnote that "Whose work is being done seems to have been the most important factor in Supreme Court decisions in somewhat similar cases", citing Linstead v. Chesapeake & Ohio Ry. Co., 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453, and Hull v. Philadelphia & Reading Ry. Co., 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670. In the Linstead case [276 U.S. 28, 48 S.Ct. 243], the question being which of two railroads was liable for an injury to a conductor, the Court said, "Now the work which was being done here by Linstead and his crew was the work of the Chesapeake & Ohio Railway * * *" and the Court distinguished the case from the earlier Hull case entirely upon the answer to the question, Which company's work was being done? Commenting upon the Hull and Linstead cases, the Court, in Robertson v. Yazoo & M. V. R. Co., 5 Cir., 159 F.2d 31, 34, pointed this out, saying "In Hull's case and in Linstead's case, both cases where a general servant of a particular employer claimed that he had become the special servant of another,

1. The defendant offered a great amount of evidence showing that Irby was hired by Westinghouse, was paid by it, made reports to it, and was a beneficiary of its insurance and compensation plans, most of which evidence went no further than to establish the admitted fact that Irby was in the general employ of Westinghouse.

the evidence was searched out to discover whose work the servant was doing, and the rule was applied accordingly." In the Robertson case the Court held that the plaintiff was not an employee of the defendant "because the evidence not only fails to show that at the time of his injury he was doing the work of the defendant, but, on the contrary, affirmatively shows that he was not."[2] The power of control of the manner in which the work is performed bears upon the ultimate question of whose work is being done and is frequently determinative of it, but there are usually a number of other factors, all of which must be considered.

Possibly, what might appear to be a conflict of authority can be accounted for if one takes into consideration what kind of liability the relationship may impose upon an alleged employer. Where the question is which of two employers shall be responsible for some carelessness in doing his work on the part of the employee, which injures a third person, it would seem logical enough to make the right to control the manner in which the employee does the work a major consideration among the various factors to be considered. On the other hand, where the principle of respondeat superior is not involved, the question being, who shall bear the economic loss arising from an injury to or death of the employee, it would be consistent with social and economic policy to give a larger measure of weight to the question, in the course of whose work was the loss incurred.[3]

In the present case, Westinghouse had sold and delivered to the Railroad Company, more than a year before Irby's death, two electric locomotives provided with certain electrical installations of an entirely new type. Irby's job at Wilmington was concerned with this equipment. Their performance had not been all that might be desired and Irby was engaged in ironing out difficulties and dealing with breakdowns so that the locomotives would operate satisfactorily in regular service. His job was described by the defendant's assistant shop foreman as being to keep the locomotives moving and to keep them in condition. It also included instructing railroad employees in how to maintain the locomotives and training them in their operation and use.

Westinghouse's business was making and selling locomotives. To the extent that Irby's work would go to make a satisfied customer of the Pennsylvania Railroad, what he was doing was part of Westinghouse's business. On the other hand, the business of the Railroad Company was operating trains and, to the extent that Irby was taking care of the locomotives, he was helping to make the trains run and was doing the work of the Railroad. If he had been merely demonstrating the locomotives in order to promote a sale, there might have been some ground for the argument that what he was doing was solely the business of Westinghouse, but the sale had been made and the Railroad had owned the locomotives for more than a year. There was nothing in the contract of sale which required Westinghouse to send an expert to follow up the performance of the equipment, and what Irby was doing when he was killed was not in the carrying out of any other obligation which Westinghouse owed. Its warranty of the locomotives had expired and, so far as it was concerned, it was merely a question of maintaining goodwill, and improving its own knowledge of the new equipment [4].

2. See also Atlantic Coast Line R. Co. v. Tredway, 120 Va. 735, 93 S.E. 560, 10 A.L.R. 1411 (a F.E.L.A. case) and Jones v. George F. Getty Oil Co., 10 Cir., 92 F.2d 255.

3. It may be noted that the discussion in the Restatement of Agency at Sections 219 and 220 is concerned almost exclusively with the question of liability to third persons for the alleged servant's tort.

4. The warranty on the novel installation, called the "ignitron" had not expired, but Irby was taking care of the whole locomotive and, at the time of his death, was not working on the "ignitron" or anything connected with it.

As has been pointed out, Irby had been with the Railroad for a period of 14 months. Of course, as to the details of those portions of his work which required the highly expert skill of a trained electrical engineer, one would not expect the Railroad to exercise control in the sense of telling him how to go about the details of his work on this or that piece of electrical equipment. As a practical matter, the same applies to Westinghouse. Few employers would be guilty of the folly of interfering with the work of an expert, be he an electrical engineer, a tool maker or a nuclear physicist.

■ Inasmuch as Irby was not at Wilmington by virtue of any contract between the Railroad and Westinghouse, the Railroad had the right to direct what he should or should not do with its equipment. Of course, the Railroad could not "fire" him from his employment with Westinghouse, but it could, without consulting Westinghouse, "fire" him from his job with the Railroad on the locomotives if he did not do the work it wanted done or did not do it in the way it wanted him to.

Not all the Irby work was of a highly expert nature. Some of the things which he did were routine work of the Railroad's regularly employed men who worked on electrical equipment [5]. As to these, as well as the specialized work which only he could do, the Railroad selected both the time and the place for the work to be done. It also appeared that Irby was "on call 24 hours a day and any time the train would break down someone from the railroad, wherever it would be, would call and tell him to come and report there." The railroad shop foreman denied that they ever gave Irby instructions as to what to do, but they would from time to time point out work to be done and, of course, he would be expected to do it.

Irby's work at times required him to ride with the trains in the cabs of the locomotives. When he did, he was under the control of the engineer and took orders from him. A locomotive engineer testified that he remembered only one occasion on which Irby rode with him and, on that occasion, performed various tasks, under his orders, which fireman or brakemen ordinarily performed, but the witness made it clear that the same condition would apply to any other time on which Irby may have ridden with him, and Mrs. Irby testified that he was frequently traveling on this locomotive which would take him away from home overnight several nights a week.

■ Irby was issued a pass on the Pennsylvania Railroad with the understanding that its use would be restricted solely to the business of the Pennsylvania Railroad Company. Such pass could lawfully have been issued under the Hepburn Act only to employees. 49 U.S.C.A. § 1(7).

■■ The fact that most, if not all, of the evidence offered by either party is uncontradicted does not remove a case from the province of the jury if "the evidence is such that fair-minded men may draw different inferences" from it. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916. "It is further established that, when different inferences can reasonably be drawn from the testimony as to whether the lender or the borrower is the controlling master at the time of the accident, or whether both of them have the right of control, the question is one for the jury." Siidekum v. Animal Rescue League, 353 Pa. 408, 414, 45 A.2d 59, 62. See also Restatement, Agency, Sec. 220(b).

■ In the present case the plaintiff was compelled to establish her case by the testimony of employees of the Railroad Company and of Westinghouse. " * * * where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." Lavender v. Kurn, supra. I would not go so far as to say that these witnesses were hostile, but it was quite evident that several of them were thor-

---

5. As a matter of fact, the work which he was doing when he was killed was a routine job which railroad electricians could have done without difficulty.

**660**

oughly enlisted in the cause of their employer and the jury would have been justified in discarding at least some of their testimony.

I am of the opinion that the jury's verdict was supported by sufficient evidence and that the defendant's motion for judgment must be denied.

It having been decided that Irby was employed by the defendant at the time of his death, the various questions raised by the defendant under the Delaware law, which would apply if he were not, drop out and need not be considered.

I find no merit in the reasons assigned by the defendant in its motion for a new trial.

An order may be submitted denying both of the defendant's motions.