Elisabeth BYRNE, Administratrix of the Estate of Joe G. IRBY, Deceased,

v.

PENNSYLVANIA RAILROAD COMPANY, Appellant.

No. 12596.

United States Court of Appeals Third Circuit.

Argued July 7, 1958.

Decided Dec. 16, 1958.

As Amended on Denial of Rehearing Jan. 9, 1959.

908

Theodore Voorhees, Philadelphia, Pa.
(Philip Price, Matthew J. Broderick,
Barnes, Dechert, Price, Myers & Rhoads,
Philadelphia, Pa., on the brief), for appellant.

B. Nathaniel Richter, Philadelphia,
Pa. (Charles A. Lord, Seymour I. Toll,
Richter, Lord & Levy, Philadelphia, Pa.,
on the brief), for appellee.

Before BIGGS, Chief Judge, and
MARIS and GOODRICH, Circuit Judges.

BIGGS, Chief Judge.

This suit, based first on the Federal
Employers' Liability Act, 35 Stat. 65–66
(1908), as amended 53 Stat. 1404–1405
(1939), 45 U.S.C.A. §§ 51–60 and second
on the Wrongful Death and Survival
Statute of the State of Delaware, 10 Del.
Code Ann. § 3704 (1953),[1] was brought
by Irby's administratrix to recover damages for his death which occurred on
January 7, 1953.

It is clear that at the time of his death
Irby, an electrical engineer, thirty-two
years old, was an employee of Westinghouse Electric Corporation. He was
killed while working on one of four
electric locomotives, built by Westinghouse and purchased from Westinghouse
by the defendant, the Pennsylvania Railroad Company. The locomotive in which
Irby was killed was in the car shops
of the Railroad at Wilmington, Delaware. His death occurred shortly after
he entered a switch compartment in the
middle of the locomotive. Although it
is not clear how the accident occurred,
the jury found that Irby was killed both
by electrocution and asphyxiation.[2]

The plaintiff administratrix alleges
that Irby was an employee of the Railroad and asserts that therefore the Federal Employers' Liability Act is applicable. The operative facts which support the plaintiff's position are as follows:

The electric locomotives were the property of the Railroad, title to the locomotive upon which Irby was killed having
passed to the Railroad November 7, 1951.
Although the locomotives bore a general
warranty, that warranty had expired
November 7, 1952, two months before
Irby's death. For the fourteen months
prior to his death he had been engaged
in the task of servicing, of "following-up", the locomotives, after their delivery to the Railroad. During this period
he had worked exclusively on the Railroad's equipment.

Irby's work was directed to keeping
the locomotives in running condition.
While he was assigned to the locomotives, he took part in regular monthly
inspections of them for the Railroad and
made recommendations in respect to
them. Also, irrespective of these inspections, from time to time he made

---

1. In view of the ground on which we dispose of the case at bar it is unnecessary
to discuss any cause of action which may
have arisen in favor of the administratrix under the law of Delaware.

The defendant, the Pennsylvania Railroad Company, concedes that there is
sufficient evidence of negligence to take
the case to the jury under the Federal
Employers' Liability Act while denying
that that evidence was sufficient under
the law of Delaware. The court below correctly stated:

"It having been decided that Irby was
employed by the * * * [Railroad]
at the time of his death, the various

questions raised by the * * * [Railroad] under the Delaware law, which
would apply if he were not, drop out and
need not be considered."

2. On October 30, 1947, Irby had executed
a general release of liability to the Railroad when he was assigned by Westinghouse to work on certain railroad equipment which need not be particularized
here. It is sufficient to state that the
equipment to which he was assigned in
1947 did not include the locomotive in
which Irby was killed and the release
is immaterial. We deem it unnecessary
to discuss it further.

recommendations for work to be done on the locomotives.

The work sheets prepared by Irby and made by him for Westinghouse enumerated several detailed tasks which could have been performed as well by the Railroad's employees if Irby had not been present. He often assisted and participated in the repair work himself. Immediately prior to his death he was engaged in the task of "stoning"[3] a generator, commutator, albeit it was one which could have been performed by a Railroad electrician. Irby was not working on an ignitron which was the distinguishing feature of the type of locomotive which he was following-up.

Irby rode the locomotives on regular runs. In one instance, on January 1, 1953, while Irby was riding in the cab of a locomotive, he acted as a fireman or a brakeman, calling out signals, and observing passing trains, under the supervision of the locomotive engineer.

Irby was on call 24 hours a day. If at any time one of the locomotives had a breakdown, someone from the Railroad would tell him to report at the scene of the breakdown. Irby immediately responded to these notifications. He reported, or at least announced his presence, to an assistant foreman, a Railroad employee in charge of locomotive maintenance at the Wilmington shops. Irby also would be advised from time to time by the foreman of the electric locomotive shop, another Railroad employee, when a defect appeared, and he was expected to take part in the repair work and did so. During the time that Irby worked on the locomotives, Railroad employees would be assigned to assist him and these employees took orders from Irby.

Irby was issued a pass on the Railroad with the understanding that its use would be restricted solely to the business of the Railroad.

The Railroad also had the right to tell Irby what he should do or should not do in respect to the locomotives. There was no contract between Westinghouse and the Railroad insofar as Irby's services were concerned.

The operative facts most favorable to the position of the defendant Railroad that Irby was not its employee are as follows:

Irby was originally employed by Westinghouse and throughout the term of his work with the Railroad's locomotives was paid solely by Westinghouse. His very extensive overtime work[4] was authorized only by Westinghouse.

Irby was supervised by Westinghouse personnel and took work assignments from them, consulting three or four times a week with his immediate supervisor in the Westinghouse organization. The Westinghouse supervisor or supervisors would examine the equipment, including the locomotives, and would discuss with Irby the nature of the difficulties encountered and possible design changes which might obviate further difficulties.

Irby made regular work reports to Westinghouse. While he made recommendations to the Railroad concerning work to be done on monthly inspections, actual reports of those inspections were not made by him and he did not sign them.

3. "Stoning" in this case was required because mica was used to separate the copper segments of the generator commutator. The mica had become high causing the brush to lift off segments of the copper which in turn burned the commutator. Irby was cleaning out the mica between the segments on the commutator.

4. Irby performed a very large amount of overtime work. It appears that he worked 40 hours a week in the course of his regular employment and that he performed 32 hours of overtime almost week in and week out. It is the contention of the Railroad that this raises an issue as to whether there could be "any time" for him to be an employee of the Railroad as well as an employee of Westinghouse. This argument is irrelevant because it cannot be contended effectively that Irby worked so many hours for Westinghouse and so many hours for the Railroad in an arbitrary division of several duties.

The locomotives were of a new design featuring an ignitron tube, used in the conversion of alternating current to direct current. Although the general warranty on the locomotives had expired at the time of Irby's death, the warranty on the ignitron tubes extended for a thirty-six month period and was still in effect at the time of Irby's death.

It was the custom of Westinghouse to have its employees "follow-up" on equipment after its delivery to customers. During the entire period that Irby was working on the locomotives, he was deemed by Westinghouse officials to be engaged in following-up the operation of the locomotives and was considered to be doing so for the benefit of Westinghouse. The follow-up was to continue until the equipment was deemed to be in satisfactory operating condition.

The foreman of the Railroad car shops at Wilmington considered that a Westinghouse employee, Coleman, was Irby's supervisor.

While Irby rode the locomotives on regular runs he did so in order to check the electrical circuits and electrical equipment. The incident of January 1, 1953, in which Irby rode in the cab of a locomotive, and performed the services of a brakeman or fireman, was the only one of its kind which any witness could recall. Also, on that day, Irby was on a holiday as his service time report to Westinghouse revealed.

The job in which Irby was engaged immediately before his death was "stoning" a generator commutator as we have stated. This was done by him with the commutator in place in the locomotive. Irby apparently thought that he was able to do the job in this manner because of his expertness. If Irby had not done the "stoning", the generator would have had to have been removed from the locomotive, a difficult and time-consuming procedure.

The court below, because of the issues presented by the Delaware law, now obviated, divided the trial into two parts. The court first limited the jury to two issues: first, whether Irby was an employee of the Railroad and, second, whether he was actually engaged in or connected with the movement of a train, at the time of the accident. On interrogatories the jury found for the administratrix on both issues. The court and the jury next heard evidence on the issues of negligence, causation and damages. The jury eventually returned a verdict for the plaintiff in the amount of $250,000 and judgment was entered thereon. The Railroad moved for judgment n. o. v. and, in the alternative for a new trial under Rule 50(b), Fed.R.Civ. Proc., 28 U.S.C. Both motions were denied. 169 F.Supp. 655. The appeal followed.

The Railroad asserts in support of its motion for judgment n. o. v. that it was not proved that Irby was its employee and in its motion for a new trial, asserted that error was committed in the exclusion of evidence which, it says, tends to support its view that Irby was employed only by Westinghouse. There is, of course, no question but that Irby was an employee of Westinghouse. The issue is whether sufficient evidence was adduced to enable the jury to conclude that Irby was also an employee of the Railroad.

The facts of business life demonstrate that manufacturers or contractors such as Westinghouse require field representatives to follow-up on sales to assure the satisfaction of their customers and to foster and protect known and established reputations for quality. With expensive and intricate machinery such as electric locomotives, the follow-up period is of necessity lengthy and requires close cooperation with the purchaser of the equipment. The designation of a vendor's employee to work with the vended equipment on the vendee's premises does not necessarily establish an employment relationship between the vendee and the employee assigned by the vendor. On the other hand a vendee may not make use of that employee, having him "do its work" and exercising the "right to control" him, accompanied by

other incidents usually connected with employment, and escape the responsibility imposed by the federal statute. The evidence as to Irby's employment looks two ways and it is impossible indeed to draw a line of demarcation between the work Irby performed for Westinghouse and that which he did for the Railroad. The evidence would support the conclusion that he was, to some extent at least, a common employee of both.

▪ This issue became one for the jury. As was said in the Restatement, Agency: "Where the inference is clear that there is, or is not, a master and servant relationship, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered."[5,6] Cf. Southern Pac. Co. v. Libbey, 9 Cir., 1952, 199 F.2d 341, 343, 346; Dougall v. Spokane P. & S. Ry. Co., 9 Cir., 1953, 207 F.2d 843, 846, certiorari denied 1954, 347 U.S. 904, 74 S.Ct. 429, 98 L.Ed. 1063.

What are the applicable legal tests or standards? In the leading case of Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 221–222, 29 S.Ct. 252, 254, 53 L.Ed. 480, the Supreme Court stated: "It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." In Shaw v. Monessen Southwestern Ry. Co., 3 Cir., 1953, 200 F.2d 841, at page 843, we stated: "The question to be determined is: By whom is an individual employed at a particular time? The question often comes up in determining whether a given worker is a servant or an independent contractor. The authority to give detailed directions in the performance of a task is a highly important consideration." In the Shaw opinion at the page indicated we also said in footnote 4, cited to the text of that opinion: "Whose work is being done seems to have been the most important factor in Supreme Court decisions in somewhat similar cases", citing Linstead v. Chesapeake & Ohio Ry., 1928, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453, and Hull v. Philadelphia & Reading Ry. Co., 1920, 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670.

▪ The word "employee" as used in the Federal Employers' Liability

---

5. Restatement, Agency § 220, Comment *b* (1933).

6. Section 220(1) provides: "A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right of control." This test is reaffirmed in Restatement, Agency 2d § 220 (1958).

Act [7] is employed in its natural sense and is intended to describe the conventional relation of an employee and employer. Robinson v. Baltimore & Ohio R. R., 1915, 237 U.S. 84, 94, 35 S.Ct. 491, 59 L.Ed. 849. While it is true that "[E]ach case must be decided on its peculiar facts * * *", Cimorelli v. New York Cent. R. R. Co., 6 Cir., 1945, 148 F.2d 575, 577, the test of who has the "right to control" the activities of the workman is the generally accepted criterion determining employment status. See Restatement, Agency § 220 (1933). The test was employed in Chicago, Rock Island & Pac. Ry. Co. v. Bond, 1916, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735 and in Del Vecchio v. Pennsylvania R. R. Co., 3 Cir., 233 F.2d 2, certiorari denied 1956, 352 U.S. 909, 77 S.Ct. 146, 1 L.Ed.2d 117, without reference to whose work was being done. But the "right to control" is a conclusion to be drawn from a consideration of all the relevant facts of the relationship between the worker and those whose work he does and, as is pointed out in both Standard Oil Co. v. Anderson and Linstead v. Chesapeake & Ohio Ry., supra, the question of "whose work is being done" is a factor which the jury must consider in determining the "right to control". We point out that the phrase "right to control" is not a single magical solvent for the "right to control" must be considered in the light of other incidents relating to the work performed. Thus the status of employment is established. See Restatement, Agency § 220, Comment *b* (1933).

As we have indicated there is evidence which, if believed by the jury—and it must be assumed here that it was believed—clearly establishes that at times during the fourteen months, Irby was engaged in activities for the Railroad and that he was called on to do so by supervisory employees of that company in connection with the locomotives sold by Westinghouse. As has been said, immediately preceding his death he was engaged in work on an electric locomotive owned by the Railroad and used by it in interstate commerce. The repairs which he was engaged in making were necessary for the maintenance of the Railroad's services.

■■ The jury was entitled to find the foregoing as facts and to conclude that the Railroad had a right of control over Irby and that he was engaged in maintaining its services, i. e. doing its work. Cf. Reed v. Pennsylvania R. R. Co., 1956, 351 U.S. 502, 76 S.Ct. 958, 100 L.Ed. 1366. The jury was entitled to reconcile the operative facts if it could do so, and attribute such weight as it desired to particular incidents and to find under a proper charge that Irby was an employee of the Railroad. Ellis v. Union Pac. R. R. Co., 1947, 329 U.S. 649, 67 S. Ct. 598, 91 L.Ed. 572; Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.

It is clear that the court below did not err in submitting the issue of whether Irby was employed by the Railroad to the jury. The question for our determination is therefore whether the charge was an adequate one. The Railroad contends that the trial judge was unwilling "to give weight to the test of 'power of control' " and apparently believed that "whose work was being done" was the "real criterion of employment" in this case. We cannot agree for we are of the opinion that the court's charge was adequate, properly stating the principles of law whereby employment must be determined. The court read to the jury, after sufficient explanation, the last two sentences of that portion of the opinion of the Supreme Court in Standard Oil Co. v. Anderson which we have quoted supra and also read that portion of the opinion of this court in Shaw v. Monessen, hereinbefore quoted, including footnote 4 cited to the text in that opinion. While the statement in footnote 4 of the opinion in Shaw v. Monessen, viz., "Whose work is being done seems to have been the most important factor in Supreme Court decisions in somewhat

7.  45 U.S.C.A. §§ 51–55, 59–60. See also Hours of Service Act, 45 U.S.C.A. §§ 61, 62, 63.

similar cases," may seem somewhat inconsistent with our present ruling, that inconsistency is more apparent than real for the issue was not in focus in Shaw v. Monessen for the reasons set out in our footnote below.[8] We point out that the trial court in the case at bar went on to state succinctly and positively to the jury: "The ultimate question is who could control the manner of the employees doing the work; who had the right to control, not who actually did. Who had the right to control it?" Moreover, at the close of the charge, the court reiterated, at the request of the Railroad, its ninth request for a charge as to the "right of control," quoting it verbatim as follows: " 'One important test in determining the employment of Irby is who had the right of control,' as I have told you."

■ On balance the charge of the court below must be deemed to be sufficient and correct. It is our opinion that the court below charged adequately in respect to all the pertinent factors involved in this aspect of the case and stated the applicable law without substantial error. But even if we were to assume *arguendo* that the charge was erroneous no cogent objection was made to it by the Railroad as required by Rule 51, Fed.R.Civ.Proc., 28 U.S.C. We therefore could not set aside the verdict for, in any event, we could not deem the charge to have been so fundamentally unfair as to have resulted in a gross miscarriage of justice. United States v. Atkinson, 1935, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555; Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed.

645. See also Callwood v. Callwood, 3 Cir., 1956, 233 F.2d 784.

■ Another point raised by the Railroad requires discussion. The railroad asserts that the court below also erred in excluding evidence which it offered on the issue of Irby's employment, and seeks a new trial. The Railroad sought to introduce the following evidence: interoffice letters from the files of Westinghouse dealing with the length of time during which "follow-up" on the locomotive was to continue; testimony by its Middle Atlantic Region Service Manager relating to the amount of Irby's overtime and the concern of Westinghouse in respect to the amount of it; testimony by the Engineering and Service Manager of the Atlantic Region of Westinghouse relating to receipt by Irby's widow of proceeds of group life insurance policies carried by Westinghouse in the amount of $32,500, compensation payments in the amount of $10,514.20 to be collected by her, and certain gratuities which she received from Westinghouse following Irby's death. The trial court rejected these offers on the ground that such evidence would be merely cumulative and that its possible prejudicial effect might outweigh its probative value.

Reviewing these offers we cannot say that the trial court committed error in excluding the proffered evidence. Burgman v. United States, 88 U.S.App.D.C. 184, 188 F.2d 637, 641–642, certiorari denied, 1951, 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 1347. At best its effect would have been only cumulative and we think that the instant case cannot be decided

---

8. It should be noted that the Shaw case was tried to the court, without a jury. Moreover, the issue, presented by stipulation, was whether Shaw was engaged in interstate commerce while working for the Monessen Southwestern Railway Company, a common carrier, "or" was engaged as an employee of the Pittsburgh Steel Company. There was no contention that he was an employee of both and the issue of common employment was not presented to the court.

The Linstead case also did not present the issue before us in the case at bar. Mr. Chief Justice Taft stated, 276 U.S. at page 30, 48 S.Ct. at page 242: "The question in the case is, for whom he [Linstead] was working when he was killed, whether for the Chesapeake & Ohio Railway Company, the respondent, *or* the Big Four Company." (Emphasis added).

In Standard Oil Company v. Anderson a similar "either-or" issue was presented.

by the bulk of evidence on the respective sides of theoretical scales.

Other issues raised by the parties do not require discussion.

The judgment of the court below will be affirmed.