# GERAGHTY v. LEHIGH VALLEY R. CO.
## No. 151.

Circuit Court of Appeals, Second Circuit.
April 16, 1934.

CHASE, Circuit Judge, dissenting.

———◆———

Alexander & Green, of New York City (Clifton P. Williamson and H. S. Ogden, both of New York City, of counsel), for appellant.

Thomas J. O'Neill, of New York City (William J. Hogan, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This action was brought by the plaintiff, as executrix and sole beneficiary, to recover damages for the injury and death of her deceased husband, James J. Geraghty, while he was employed as a freight conductor by the defendant railroad. The complaint alleged that his injury and resulting death were caused by the defendant's negligence or by defective couplers upon its cars at a time when he was engaged in interstate commerce.

The defendant rested at the conclusion of the plaintiff's case, and moved for a directed verdict. This motion the court reserved and ultimately denied, as it did also a motion to set aside the verdict. See (D. C.) 3 F. Supp. 376. From the judgment entered on the verdict, the defendant has appealed.

The principal questions raised by this appeal are whether the plaintiff proved a case under the Federal Employers' Liability Act (45 USCA §§ 51–59) and whether the Federal Safety Appliance Acts (45 USCA § 1 et seq.) apply.

The first question must be answered in the negative. Upon the undisputed facts we think it is impossible to hold that Geraghty was employed in interstate commerce at the time of his injury. The accident occurred at the plant of the American Smelting & Refining Company located near Perth Amboy, N. J. This plant was inclosed by a high fence, and within the inclosure were many buildings and nearly 30 miles of railroad track. In the fence was a gate controlled by the smelting company to permit engines and cars to enter or leave its plant. Once cars had passed this gate, the initial placement of them and all subsequent movement was done only upon orders of the smelting company's yardmaster, Sprague. Pursuant to an arrangement with the smelting company, the defendant was accustomed to send an engine and crew, of which Geraghty was in charge, to do switching within the plant. It did so on February 3, 1932, the date of the accident. The car movement in which Geraghty was engaged when he sustained injury related to five cars which had been delivered at the plant the previous day loaded with interstate shipments of scrap lead. These cars reached the defendant's Perth Amboy yard on February 1st; the bills of lading were given up, and the defendant delivered them at the plant at 10:20 a. m. on February 2d. After being weighed by the smelting company upon its scale, the cars were placed in accordance with orders given by Sprague. Two of them were put within the converter building for unloading by the smelting company's employees; of the other three, two were left upon track 8 and one on the so-called storage track. Shortly before 1 p. m. on February 3d, Sprague gave Geraghty orders to remove from the converter building the two cars placed there the day before, which in the meantime had been unloaded by the smelting company's employees, and to replace them with the three loaded cars. Geraghty proceeded to carry

out these orders. The switch engine hauled the three loaded cars to a point on track 6 near to the converter building and then uncoupled and backed in on the converter track to get the two unloaded cars out of the way. Between them and the engine were several flat cars owned by the smelting company and used by it solely within its plant. One of the flat cars, No. 115, was coupled to the two unloaded cars. The other flat cars were a string of four and it was necessary to couple them to the east end of car No. 115 in order to pull out the two unloaded cars. Geraghty, who gave signals to the engineer for this coupling, stepped between the cars as they were about to meet. They came together lightly and made a coupling at the first impact, but Geraghty was so badly crushed between them that he died two days later. It was possible to infer that he went between the cars to adjust the couplers, which a subsequent examination disclosed to be so badly worn as to allow the end sills to come too close together.

■ Upon these facts it must be held that the car movement upon which Geraghty was engaged was not interstate commerce, but a local switching movement. The bills of lading had been given up and the five interstate cars had come to their destination on the day preceding the accident. Any subsequent movement of them within the plant was wholly subject to the smelting company's control and for its convenience. Interstate movement ceases when cars reach their destination and are merely awaiting discharge by the consignee, even though they must be moved again to get to the place of discharge, Delaware, L. & W. R. Co. v. Peck, 255 F. 261 (C. C. A. 2); Schauffele v. Director General, 276 F. 115 (C. C. A. 3). To the same effect are Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941, and Lehigh Valley R. Co. v. Barlow, 244 U. S. 183, 37 S. Ct. 515, 61 L. Ed. 1070, for it can make no difference in respect to the interstate character of the movement whether the goods transported are the carrier's or the consignee's, nor how long they have been at rest after delivery. Neither is it material that the unloaded cars would be returned into interstate commerce, for they had not yet been assigned to or accepted by the defendant for a journey outside the limits of the plant. See Wise v. Lehigh Valley R. Co., 43 F.(2d) 692, 694 (C. C. A. 2); Coe v. Errol, 116 U. S. 517, 528, 6 S. Ct. 475, 29 L. Ed. 715; cf. Phila. & Reading R. Co. v. Hancock, 253 U. S. 284, 40 S. Ct. 512, 64 L. Ed. 907. A more plausible argument is made by the plaintiff on the ground that the defendant was to receive no extra payment for this switching, from which it is inferred that delivery to the place of unloading was included within the interstate freight rate. The proof was no more than that Sprague entered on his time sheet no credit to the railroad for switching of interstate cars, while his practice was to give credit for time spent in switching cars owned by the smelting company. It may be that the defendant did this work gratis; but we cannot see that this is material. Whether the carrier received extra compensation or regarded it as paid for by the through rate, the switching was a local plant movement after the interstate journey had come to an end. Cf. Delaware, L. & W. R. Co. v. Peck, supra. Finally, the plaintiff argues that the cars, which had been weighed loaded, were to be reweighed empty in order to check the tonnage of the interstate shipment, upon the basis of which tonnage the freight was collected; and therefore the cars should be deemed to continue in interstate commerce until the reweighing was accomplished, or at least the taking of an empty car to the scales should be held to be so intimately related to interstate commerce as to constitute a part of it. As to the latter branch of the argument, it is sufficient to say that Geraghty was not engaged in taking the unloaded cars to the scales when his injury befell. As to the former branch of the argument, some support may be found for it in the language of Wheeling Terminal R. Co. v. Russell, 209 F. 795 (C. C. A. 4), although the actual decision does not go so far. There the empty cars which were being weighed were already made up into an interstate train for their return journey; if the court meant that from the time of their arrival they remained in interstate commerce until weighed empty, we cannot agree.

■ Since Geraghty was not engaged in interstate commerce and the jury was allowed to find that he was, the judgment must be reversed unless the issue of interstate commerce is immaterial. The plaintiff contends upon this appeal that it is, because a violation of the Safety Appliance Acts was proved to have caused Geraghty's death. The defendant denies that the acts were applicable or a violation of them proved. These acts protect railroad employees injured as a result of any violation of their provisions regardless of whether or not the employees were engaged in interstate commerce. South-

ern R. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72; Texas & Pac. R. Co. v. Rigsby, 241 U. S. 33, 41, 36 S. Ct. 482, 60 L. Ed. 874. Section 2 of the first Safety Appliance Act (Act March 2, 1893, c. 196 [45 USCA § 2]) reads as follows:

"*Automatic couplers.* It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

■ By the amendatory act of 1903 (Act March 2, 1903, c. 976, § 1 [45 USCA § 8]), the foregoing requirement was extended "to apply to all ° ° ° cars ° ° ° used on any railroad engaged in interstate commerce ° ° ° and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith." The defendant contends that the tracks within the smelting company's inclosure were a "plant facility" and not a part of "any railroad engaged in interstate commerce." Although the question is not free from doubt, we believe the defendant's contention that these requirements do not apply to the defendant's use of the smelting company's cars which never left its plant cannot prevail. The Supreme Court has said that the acts "embrace all locomotives, cars, and similar vehicles used on any railroad which is a highway of interstate commerce." Southern Ry. Co. v. United States, 222 U. S. 20, 26, 32 S. Ct. 2, 4, 56 L. Ed. 72; Texas & Pac. Ry. v. Rigsby, 241 U. S. 33, 41, 36 S. Ct. 482, 60 L. Ed. 874; St. L. & San Fran. R. R. Co. v. Conarty, 238 U. S. 243, 250, 35 S. Ct. 785, 59 L. Ed. 1290. It seems somewhat unreal to designate the "plant facilities" of a single shipper as a "highway of interstate commerce." Nevertheless at times tracks in the yard would be used as such a "highway." Such was their use by the defendant in delivering the cars of scrap lead on February 2d, and such would be their use if loaded cars for interstate transportation were accepted at the plant, as undoubtedly was the case at times. Cf. Phila. & Reading R. Co. v. Hancock, 253 U. S. 284, 40 S. Ct. 512, 64 L. Ed. 907. In handling incoming and outgoing interstate freight, the defendant would clearly be within the terms of the statute, and, since it makes no difference that the particular movement causing the injury be intrastate, we think the statute is applicable to any movement of cars by the defendant upon tracks over which in-

terstate commerce occasionally moves—such tracks are part of a "railroad engaged in interstate commerce." See Devine v. Chicago & C. R. Co., 259 Ill. 449, 102 N. E. 803; Lovett v. Kansas City Term. R. Co., 316 Mo. 1246, 295 S. W. 89; Gray v. Louisville & N. R. Co., 197 F. 874 (D. C. E. D. Tenn.); Chicago, B. & Q. R. Co. v. United States, 211 F. 12 (C. C. A. 8). The cases indicate that the acts are to be liberally construed in order to effectuate the legislative purpose to extend the regulation to the utmost limits of congressional power. It is true that there is no explicit proof that interstate traffic moved over the converter track on which the accident occurred. However, it appears that this track was in the ordinary path of car movements within the plant and an integral part of the trackage system. We think, therefore, that it was unnecessary for the plaintiff to make positive proof that interstate commerce was moved over this specific track, for at least its physical and functional connection gives rise to the reasonable assumption that it did. To overcome that inference the defendant should bring forward proof that its services were in fact confined to those in which no cars moving in interstate commerce engaged.

■ The defendant contends that, even if applicable, the evidence is insufficient to prove a cause of action for violation of the automatic coupler requirement. There is no direct testimony that Geraghty went between the cars for the purpose of effecting a coupling operation. In order for the plaintiff to recover, he must have been so engaged. St. Louis, etc., Ry. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290; Lang v. N. Y. Cent. R. Co., 255 U. S. 455, 41 S. Ct. 381, 65 L. Ed. 729. But the inference is most reasonable that such must have been his purpose; and one of the witnesses testified that he stepped between the cars "as [if] to adjust a coupling." The evidence also discloses a defective condition of the coupling apparatus; the coupler head on car No. 115 being 5¼ inches "out of gage" on account of a "worn out knuckle pin and knuckle lock, which prevented the lock from working properly," and there being also excessive wear in the coupler parts of the other car. This resulted in the end sills coming too close together when the cars were coupled. They also lacked a centering device such as more modern railroad cars are usually equipped with. There is no direct testimony that the condition of the cars rendered them incapable of coupling automatically on impact. In fact they did couple

304

on the first contact, but whether they would have done so had Geraghty not stepped between them is not shown. The defendant says it is mere speculation for the jury to find they would not. The plaintiff argues that from the fact Geraghty thought it necessary to step between them the jury may infer that the couplers were out of alignment or for some other reason required manual adjustment to make the coupling. We think such an inference is permissible. If alignment or other adjustment were necessary it would supply evidence to carry the case to the jury. Atlantic City R. R. Co. v. Parker, 242 U. S. 56, 59, 37 S. Ct. 69, 61 L. Ed. 150; Hampton v. Des Moines, etc., R. Co., 65 F.(2d) 899 (C. C. A. 8).

 Nevertheless we cannot say that the error of leaving to the jury the issue of whether Geraghty was engaged in interstate commerce was immaterial. The defendant pleaded his contributory negligence. Where the action is brought under the Employers' Liability Act, no employee can be guilty of contributory negligence if his injury or death was caused by a violation of the Safety Appliance Acts (45 USCA § 53); but if the Employers' Liability Act is inapplicable, as it is when the employee is not engaged in interstate commerce, then the defense of contributory negligence still remains to the railroad despite its violation of the safety appliance requirements. Schlemmer v. Buffalo, etc., Ry. Co., 220 U. S. 590, 596, 31 S. Ct. 561, 55 L. Ed. 596; San Antonio & A. P. R. Co. v. Wagner, 241 U. S. 476, 481, 36 S. Ct. 626, 60 L. Ed. 1110; Hampton v. Des Moines, etc., R. Co., 65 F.(2d) 899 (C. C. A. 8). The evidence would at least permit a contention that Geraghty was guilty of contributory negligence. He was in control of the switching movement and giving signals to the engineer. If he discovered that the couplers were out of alignment or otherwise required manual adjustment, it would seem that prudence may have demanded that the engine be brought to a stop before he undertook to make it. See Hampton v. Des Moines, etc., R. Co., supra. At least the defendant would doubtless have requested that that issue be left to the jury, had the court ruled, as it should, that Geraghty was not engaged in interstate commerce. Ruling as it did, the issue of contributory negligence was removed from the case. Hence it cannot be said that the jury's verdict would necessarily have been the same, if the error as to interstate commerce had not occurred. Accordingly the judgment must be reversed.

 The appellant further contends that at the time of the accident Geraghty was the servant pro hac vice of the smelting company. Reliance is placed on such authorities as Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480, and Linstead v. Ches. & Ohio R. Co., 276 U. S. 28, 48 S. Ct. 241, 72 L. Ed. 453. We think they are inapplicable. While Sprague, the smelting company's yardmaster, directed Geraghty where to place cars within its yard, he had no supervision or control over how the work was to be performed by the defendant's switching crew.

Complaint is also made that the conduct of plaintiff's counsel was unfair and prejudicial. While we find it unnecessary to consider whether a reversal would have been required on this ground, it is appropriate to express our disapproval of the liberties which were allowed plaintiff's counsel during the examination of witnesses to interject comments and arguments for the obvious purpose of affecting the jury. It is to be hoped that on the new trial he will observe the proprieties or, if necessary, be held more strictly in check by the trial judge.

The judgment is reversed, and the cause remanded for a new trial.

CHASE, Circuit Judge, dissents without opinion.