Raymond P. WARD, Appellant,

v.

ATLANTIC COAST LINE RAILROAD COMPANY, Appellee.

No. 17166.

United States Court of Appeals
Fifth Circuit.

March 12, 1959.

Neal P. Rutledge, Earl Faircloth, Miami, Fla., for appellant.

Sam T. Dell, Jr., Gainesville, Fla., Lazonby, Dell, Graham & Willcox, Gainesville, Fla., of counsel, for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal by the plaintiff from a judgment following a jury's verdict for the defendant in an action under the Federal Employers' Liability Act, 45 U. S.C.A. §§ 51–60, for damages for personal injuries allegedly caused by the negligence of his alleged employer, the railroad defendant.

Before we can consider the merits of the appeal we must pass upon appellee's motion to dismiss for failure to file timely notice of appeal.

Judgment was entered against appellant in the United States district court in Gainesville, Florida, on December 5, 1957. According to appellant's uncontroverted affidavits, appellant's counsel in Miami, Florida, mailed a notice of appeal by air mail to the clerk of the district court in Gainesville, depositing it in a United States mail depository at about 5:00 P.M. on January 2, 1958. The clerk's office in Gainesville has only one employee, the deputy clerk. She was absent from the office on annual leave on January 2 and 3, 1958, and the office was therefore not open on those days. The office was also closed the following day, Saturday, January 4, 1958. It had been regularly closed on Saturdays since February 13, 1956, due to the fact that in order to keep the office open six days a week with only one employee it would have been necessary for her to work more than the forty hours of a federal employee's regular work-week.

Since no one was there to open the mail until Monday, January 6, appellant's notice of appeal was not marked as received and filed by the clerk's office until that date, which was one day after the time for filing notice of appeal had expired.[1]

Appellant's affidavits assert that the notice should, in the ordinary course of air mail delivery, have arrived at the post office in Gainesville on Friday morning, January 3, and if so it would have been received in the clerk's office, located in the post office (or received in the post office box which appellant states is maintained by the clerk), during regular business hours on January 3 if the office had been open as required by F.R.Civ. P. rule 77(c), 28 U.S.C.A.[2] His affidavits further assert that if, contrary to the best recollection of the clerk who mailed it, the notice was sent by regular mail rather than by air mail, then the notice of appeal would have been received during business hours on Saturday, January 4. Appellant contends that Rule 77(c) required the Gainesville office to be open on Saturday mornings, which were regular business hours in that community; and that appellant's counsel had a right to assume that the clerk was complying with this requirement.

■ Accepting these uncontroverted facts as true, we conclude that appellant is entitled to the presumption that his notice of appeal was placed in the post office box of the clerk of the district court within the required time, notwithstanding the failure of the clerk or his deputy manually to take possession of and mark the notice "filed" until Monday, January 6, 1958. Being in the custody of the clerk, it met the requirement[3] that it be "actually" received in the clerk's office within the thirty-day period.

■ In so ruling we do not depart from the well-established principle that the jurisdictional[4] requirement that notice be filed within thirty days is not met by deposit of notice in the mail in time for it to reach the clerk's office in the usual course of mail delivery within the time allowed.[5] The distinction here is that the failure to mark the notice "filed" can be attributed to the absence of the clerk, whereas in the usual case such failure is taken to indicate that it was not actually in the custody of the clerk.

Nor do we pass upon the correctness of the rule applied in Casalduc v. Diaz, 1 Cir., 117 F.2d 915, cited by appellee. In that case the appellant's counsel swore that he had slipped a notice of appeal under the clerk's door after business hours. The court held that the notice had not been placed in the actual custody of the clerk by this action and therefore it had not been filed according to law. The court clearly believed that the attempted filing had taken place *after business hours* on the last day of

1. The applicable statute reads in part:
   "Except as otherwise provided in this section, no appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree." 28 U.S.C.A. § 2107.
   The applicable rule of procedure reads in part:
   "When an appeal is permitted by law from a district court to a court of appeals the time within which an appeal may be taken shall be 30 days from the entry of the judgment appealed from * * *

"A party may appeal from a judgment by filing with the district court a notice of appeal. * * *" F.R.C.P. rule 73.

2. "The clerk's office with the clerk or a deputy in attendance shall be open during business hours on all days except Sundays and legal holidays. * * *" F.R. C.P. rule 77(c).

3. Casalduc v. Diaz, 1 Cir., 117 F.2d 915.

4. Knowles v. United States, 5 Cir., 260 F.2d 852, 854; Marten v. Hess, 6 Cir., 176 F.2d 834.

5. See Poynor v. Commissioner, 5 Cir., 81 F.2d 521; cf. Lejeune v. Midwestern Ins. Co. of Oklahoma City, Okl., 5 Cir., 197 F.2d 149.

the legal period. Under such circumstances, it stated that the proper procedure for counsel to follow was to seek out the clerk or deputy clerk and to deliver the notice to him personally. We are not presented with such circumstances here. We have concluded that the notice was placed in the clerk's post office box during regular business hours on a day of the week when the clerk's office was regularly open for business. We see no reason to require counsel in another city to take affirmative steps to learn whether anyone was in the office during such hours and if no one was in the office, to seek out the clerk or his deputy.

■ We hold nothing more than this: It is the time when the clerk receives actual custody of the notice which determines whether this court has jurisdiction over the appeal,[6] and under circumstances such as are present in this case, the notice may be received in the clerk's custody and control even though it has not yet been manually handled and marked "filed" by the clerk or his deputy.

We turn to a consideration of the merits of this appeal.

The trial below produced conflicts in the evidence relating to several major issues, but only one of these issues is argued on appeal. This is the issue as to whether appellant was working as appellee's employee when his injury allegedly occurred. He was allegedly injured while working on a privately owned siding which was connected with appellee's tracks. The siding was built by the defendant railroad for the primary use, and at the expense, of a turpentine company which owned the land on which it lay, but during the season when watermelons were harvested in that neighborhood the siding was also, by permission of the owner, used to load cars with watermelons, which would be shipped on appellee's tracks. It was stipulated by the parties that the siding was used in interstate commerce.

The turpentine company had agreed with the railroad that it, the turpentine company, would maintain and repair the side tracks so as to conform to the railroad's maintenance and safety specifications. Appellee's track foreman in charge of the section of appellee's track which connected with the turpentine company's siding was, according to appellee's rule book, responsible "for the proper inspection and safety of tracks, bridges and trestles (including those privately owned), culverts and station grounds" within this section. However, he testified that his duty with respect to private tracks was limited to inspection and did not include the duty of maintenance which he had with respect to the railroad's own tracks. This was reiterated by the testimony of the superintendent of the local district of the Atlantic Coast Line Railroad.

The foreman, I. H. Keene, inspected the siding shortly before the day of the accident here involved and he found that the track needed repair. He informed the turpentine company's president, D. P. McKenzie, about these findings, and as was customary, McKenzie asked Keene if he would see that the tracks were fixed so as to meet the railroad's regulations. Keene agreed to do this, and on Friday, May 21, 1954, after his repair crew had finished its regular, five-day, forty-hour work-week, he asked the crew, which included appellant as its apprentice foreman, if it would like to repair the McKenzie siding the following day, for which it would be paid at overtime rates. The crew agreed to do it, and the next day, Saturday, the men reported to work at the railroad's tool shed at their usual reporting time, took their regular railroad tools, and proceeded to the McKenzie siding, where they began replacing some defective ties. McKenzie was present when the men arrived at the job site, but he left soon thereafter and the work was carried out under foreman Keene's direction. In the course of this work, ap-

6.  See Silverton v. Valley Transit Cement Co., 9 Cir., 237 F.2d 143.

pellant allegedly received the injury which is the subject of this action.

Pointing to these facts, appellant says the injury occurred in the course of his employment by appellee and he asserts that appellee cannot avoid liability for it by means of any arrangement with McKenzie governing maintenance of the siding. Appellee contends, on the other hand, that the rest of the facts of the case support a finding that appellant was working for McKenzie and not for appellee.

The facts relied upon by appellee include the following: It was admitted that this siding was owned by the turpentine company, not by appellee. It was stated without contradiction by the witness Keene that he had no duty to keep privately owned sidings in repair.[7] Appellee's other witnesses testified that the railroad company itself had no such duty.

Keene testified that he and his crew had repaired private tracks on numerous occasions and that they had never done it on a regular work day; it had always been on Saturday, their day off. Appellee's witnesses admitted that appellee's management knew of this practice whereby the railroad's employees, using the railroad's tools, repaired privately-owned sidings on their day off; but they testified that no one connected with appellee's management had ordered Keene to make these repairs.

Keene testified, and it may be taken as true, that the crew's regular Atlantic Coast Line wages were paid twice monthly by Atlantic Coast Line checks, but when it worked on private tracks on Saturdays the men were paid at the end of each day's work—either in cash or by a check drawn on the account of the owner of the tracks. That is what occurred on this occasion.

Keene also testified, and his testimony was supported by the testimony of the two other members of the crew who tes-

tified, that when he told the crew about the McKenzie job he merely offered them a chance to earn some extra money on their day off and did not order them to work. He testified that if the men did not choose to work on these jobs, this would not affect their standing with the railroad in any way. Keene and the two laborers testified that the crew, including appellant, *voluntarily* agreed to work and *voluntarily* agreed on the time they would report to work. Keene and one of the laborers testified that when the men reported on Saturday he warned them that they would be working for McKenzie and not for the railroad and therefore they should be careful to avoid any accidents. Keene testified that he thought he had also told them this on Friday, but he was not certain. He said he had definitely told appellant on previous occasions that he would be working for someone other than the railroad.

All of the testimony on this last point was contradicted by appellant. He testified that on Friday, May, 21, 1954, Keene told the crew to report for work on Saturday at the regular time to repair the McKenzie siding; that Keene had told him that Mr. Sanders, appellee's roadmaster, had told Keene to repair the siding; that he was never told he was working for McKenzie; and that he believed he was working for appellee that Saturday.

With the evidence in this posture, the trial court charged the jury that appellant was working on the siding as appellee's employee unless he had been told beforehand that he would be working for a third party and he had accepted the job with this knowledge. The court instructed the jury that if they found that he had known this when he went out to work that Saturday he could not recover.[8] The jury awarded a general verdict of no recovery and judgment was entered thereon.

7. The only evidence which came close to contradicting this was the aforementioned rule book and appellant's testimony that Keene had informed him that the road-

master had "told him [that the crew] had to repair this particular siding."

8. The railroad was the only party named as a defendant in this suit.

Appellant's arguments are directed at the court's charge to the jury. First, he says the court erred in refusing to charge that, as a matter of law, appellant was employed by the railroad at the time he was allegedly injured. Alternatively, he argues that the court erred in refusing to charge the jury concerning "the usual and standard legal criteria for determining the employer-employee relationship"—that is, the locus of the power to control the employee and to dismiss him, the source of his wages, and so forth.

■■■ In passing upon appellant's contentions we start from the premises, first, that the appellee could incur no liability under the F.E.L.A. for appellant's injury unless there existed an employer-employee relationship between the parties at the time of the accident, Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849; Chicago, Rock Island & Pac. Ry. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L. Ed. 735, and second, that the terms "employee" and "employed" in the F.E.L.A.[9] are used in their usual and natural sense, importing the conventional relation of employer and employee. Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 94, 35 S.Ct. 491, 59 L.Ed. 849.

■■■ It is a fundamental principle of law that the relation of employer and employee is a relation created by contract, either express or implied. New Amsterdam Cas. Co. v. Soileau, 5 Cir., 167 F.2d 767, 6 A.L.R.2d 128; Fleming v. A. H. Belo Corp., 5 Cir., 121 F.2d

207, affirmed Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. If appellant failed to prove that he had a contract of employment with appellee covering this Saturday labor, then he cannot recover damages from appellee in this action.

■ The possibility that appellant could have been repairing the McKenzie siding under an express contract with appellee is easily dismissed, for as the foregoing recital of facts demonstrates, the evidence permitted the jury to find that Keene had told appellant, and appellant believed, that he was working for McKenzie, not for the railroad. Although appellant argues that by virtue of its charge to the jury the court erroneously held as a matter of law that appellant was not working for the railroad and permitted the jury to consider only the question of whether he *knew* it, a reading of the complete charge on this issue makes it clear that the court did not. It carefully charged the jury that the "Railroad Company was liable unless the defendant's foreman made it clear to him before he started to work that morning that they were not working for the Railroad, but working on a private track to make some extra money." In other words, the court reduced the issue of employment to the narrow question of whether "he was * * * advised ['that he was working for some third person and not the Railroad'] before he went out there to work, and he went out on his own volition and joined the others to make some extra money."[10]

9. 45 U.S.C.A. § 51.

10. The pertinent portions of the court's charge concerning the employment issue were as follows:

"That the Railroad Company was liable unless the defendant's foreman made it clear to him before he started to work that morning that they were not working for the Railroad, but working on a private track to make some extra money. I think I put it just about that simply, didn't I, to make some extra money. I told you that if the foreman failed to make that disclosure to him, ordered him

to go out there and go to work, and put him to work on that private track, the Railroad Company would be liable. I don't see how I can say it any plainer. Do you have a word that you think I could use to make it any plainer?

"Mr. Rutledge: Your Honor, to make it clear he was working for some third person and not working for the Railroad.

"The Court: Yes, sir, that is the word I believe he suggested—that he was working for some third person. The foreman had to make it clear to him that he was working for some third person and not the Railroad. I thought I said

The cases cited by appellant to show that the court should have charged the jury that the question of employment should be resolved by weighing "the usual and standard legal criteria for determining the employer-employee relationship" are all distinguishable from, and inapplicable, to the present litigation. One group [11] of these cases involve the "borrowed servant" situation wherein an employee is loaned by his general employer to another employer and there is no direct proof that the employee had actual knowledge of, or gave his consent to, a change in employment, and it is thus necessary to weigh all of these "usual and standard legal criteria" to determine whether the employee has in fact changed employers. We hold that the lower court correctly ruled, in effect, that even if all the indirect evidence—i. e., right to control, source of wages, etc.—tended to show that appellant was acting in appellee's employ at the time of his injury, the jury should nevertheless find that he was not so employed if they found from other evidence that he had *agreed* to work that Saturday *for McKenzie* or (what amounts to the same thing) he understood that his regular employer *refused* to extend its contract of employment to cover this work.

If the charge erred, it erred in appellant's favor, for when the court charged "that the Railroad Company was liable unless the defendant's foreman made it clear to him before he started to work that morning that they were not working for the Railroad" it resolved all the circumstantial evidence, such as the right to control the crew's work, in favor of appellant, although the evidence was subject to varying inferences and might have been resolved differently by the jury. The only question which the court did not resolve in appellant's favor was the question whether the parties had made an *agreement* that appellant would work for appellee or an *agreement* that he would work for McKenzie.[12]

The second group of cases [13] cited by appellant to support his contention that the court should have submitted these criteria to the jury involve a question which is related to but not the same as the loaned servant doctrine just discussed. They are concerned with whether the employee of an alleged independent contractor is to be considered as an employee of the railroad which contracted for the services of the independent contractor, so as to permit the employee to sue the railroad under the F.E.L.A. Here too the courts discussed the criteria presented here by appellant, but in none of these cases were the courts dealing with an employee who had been expressly told beforehand that he would not be working for the railroad. In none of them, therefore, was there an issue as to whether the parties had expressly negated the existence of the legal relation which the circumstantial evidence estab-

it, but I guess I didn't spell it out as much as he wanted, but I want to make that clear to you. If you find from this evidence he was so advised before he went out there to work, and he went out on his own volition and joined the others to make some extra money, then he was not an employee of the Railroad Company and they would not be liable. So you approach this case and consider that question first, and if you decide that case in favor of the Railroad, you will return a verdict for the Railroad and you don't have to worry about all the other problems. You will retire and consider your verdict."

11. Linstead v. Chesapeake & O. Ry. Co., 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453; Geraghty v. Lehigh Valley R. Co., 2 Cir., 70 F.2d 300; Halderman v. Pennsylvania R. Co., 2 Cir., 53 F.2d 365; Woodward Iron Co. v. Limbaugh, 5 Cir., 276 F. 1; The Slingsby, 2 Cir., 120 F. 748.

12. Depending on whose version of the facts was correct, Keene was authorized either by Atlantic Coast Line or by M. and M. Turpentine to make an offer to a contract of employment.

13. Dougall v. Spokane, P. & S. Ry. Co., 9 Cir., 207 F.2d 843; Pennsylvania R. Co. v. Barlion, 6 Cir., 172 F.2d 710; Cimorelli v. New York Cent., 6 Cir., 148 F.2d 575.

lished as a matter of fact or of legal construction. Thus it was proper there, but improper here, for the issue to be decided by the application of these legal criteria to the circumstantial evidence of employment.

Consideration of this last group of cases brings us to the question whether, despite the expressly manifested intent of the parties not to enter into a relation of employer and employee, they have, by their conduct, unwittingly (or even unwillingly) entered into such a relation.[14] This is the question raised by appellant's other major contention: that he was covered by the F.E.L.A. as a matter of law.

Appellant's theory is that the McKenzie siding and the maintenance thereof were part of appellee's "total enterprise"[15] and the arrangement between McKenzie and appellee concerning the maintenance of the siding was simply an illegal device to avoid liability under the F.E.L.A.

■ It should be obvious at the outset that the statutory provision[16] against devices to avoid the employer's liability cannot be used to prove the existence of the legal situation—the employer-employee relationship—which calls into play both the statute creating this liability and the provision thereof which forbids any devices intended to avoid such liability. In Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849, the Supreme Court construed a Pullman Company employee's contract of employment which released from liability all railroad companies over whose tracks he might travel in the course of his service for Pullman. He contended that the contract was rendered illegal and void by the predecessor of the provision relied upon by appellant. The court stated, 237 U.S. at page 91, 35 S.Ct. at page 492:

"The application of this provision depends upon the plaintiff's employment. For the 'liability created' by the act is a liability to the 'employes' of the carrier, and not to others; and the plaintiff was not entitled to the benefit of the provision unless he was 'employed' by the railroad company within the meaning of the act."

■ When we examine the cases cited by appellant we find that none of them applies to the set of facts with which we are dealing. Atlantic Coast Line R. R. v. Meeks, Tenn.App., 208 S.W.2d 355, certiorari denied 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112, and Virginia Ry. Co. v. Early, 4 Cir., 130 F.2d 548, both involved injuries to employees who were engaged in activities "necessarily incident" to actual service for the railroad. In the one case the employee was resting in a shanty car provided by the railroad for a repair gang which was "on call" by the railroad at all times, and in the other case the injured employee was on the railroad's property returning from a company-maintained lunchroom to the machine shop where he worked for the railroad. We think it clear that the court below could not

14. Cf. Atlantic Coast Line Railroad Co. v. Tredway's Adm'x, 1917, 120 Va. 735, 93 S.E. 560, 562, 10 A.L.R. 1411, certiorari denied 245 U.S. 670, 38 S.Ct. 191, 62 L.Ed. 540, where the Virginia court observed:

"The word 'employed,' and more especially the word 'employee,' considered apart from their context in the federal act [F.E.L.A.], are ambiguous in their meaning. They may be limited in meaning by the idea that an express contract of hiring by the carrier of and the payment of wages by the latter to the employee are essential to bring him within the provisions of the act. Or they may

have a broader meaning and include as employees all who are engaged in the discharge of duties of servants of the carrier, whose service is knowingly accepted by the latter."

15. Sinkler v. Missouri Pac. R. Co., 356 U.S. 326, 331, 78 S.Ct. 758, 2 L.Ed.2d 799.

16. "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void * * *." 45 U.S.C.A. § 55.

have ruled as a matter of law that appellant's voluntary work on this privately-owned siding on his regular day-off was a "necessary incident" of his regular employment. Even if it be conceded, *arguendo*, that the doctrine was applicable at all, the court would have been obliged by the evidence, including testimony that appellant's position with appellee would not have been jeopardized if he had declined to do this extra work, to submit the question to the jury, as the court did in Atlantic Coast Line R. R. v. Meeks, supra.

Chicago, R. I. & G. Ry. Co. v. Trout, Tex.Civ.App., 224 S.W. 472, and Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 1 A.L.R.2d 290, involved the loaned servant situation discussed earlier in this opinion. Neither of the plaintiffs in these cases consented to a change of employers,[17] whereas, as we have seen, there was a clear jury question as to whether appellant Ward consented to work for someone other than the Atlantic Coast Line, his regular employer.

Erie R. Co. v. Margue, 6 Cir., 23 F. 2d 664, also cited in support of appellant's contention that he was covered as a matter of law, is in some ways closer to the present case, but there are legal differences between the two situations and these demand different legal conclusions. The Margue case involved a contract by which the defendant railroad employed a construction company to maintain the railroad's tracks, roadways and structures, using its own employees. The railroad company agreed to furnish, without charge, the tools, camp cars, laborers' quarters, train equipment, work train service, and telegraph service needed for the work, to carry the necessary supplies over its lines, to pay for the labor and material used in the work, and to pay the construction company for its services five per cent. of the cost of such labor and materials. The construction company agreed to comply with the workmen's compensation laws of the state in which it was operating, and the railroad agreed to reimburse it for all expenses incurred under these laws. The court held that an employee of the construction company was an employee of the railroad and that this contract was inoperative to insulate the railroad from liability, because Section 5 of F.E.L.A. nullifies all contracts intended to exempt carriers from their liability under the Act.

The court distinguished the decisions of the Supreme Court which had held that the claimants involved therein were not employees of the defendant railroads, but rather of independent contractors.[18] The court drew the following significant distinction:

"It might well be argued that the duty of a railroad company to maintain its right of way, over which it and it alone operates its trains, cannot be delegated to another, so as to relieve the company of any part of its responsibility therefor—certainly, not as to the public which it serves, and perhaps not as to those who work upon its tracks. Whether that be so or not, that responsibility is quite a different thing from the services involved in the cases referred to—the loading or unload-

17. In the Fitzjohn case the plaintiff's testimony that he had never been advised of nor consented to a change in employment was uncontradicted, 165 F.2d at page 476, and the other evidence on this point was all in his favor. Therefore the trial court was able to rule as a matter of law that the plaintiff was still in the employ of his regular employer. In the Trout case it was the railroad which contended that the question of employment should be decided as a matter of law. The appellate court held that the evidence was sufficient to submit the question of the employee's consent to the jury, 224 S.W. 474, and the jury verdict in favor of the employee was allowed to stand.

18. Wells Fargo & Co. v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205; Chicago, R. I. & Pac. R. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735; Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 85, 35 S.Ct. 491, 59 L.Ed. 849.

ing of cars with coal at a terminus, or the performance of a special service, such as express and sleeping car companies perform, *and which the railroad itself is not legally bound to perform. The maintenance of defendant's railroad tracks was essential to the exercise of its franchise rights.* \* \* \*" (Emphasis added.) [23 F.2d 665.]

■ This distinction is also of manifest importance in the appeal before us. Unless appellant has proved that the duty to maintain this privately-owned track has been assumed by, or was imposed by law on, the Atlantic Coast Line, then the question is not whether the railroad *could legally* insulate itself from its liability as employer of the maintenance crews by agreeing with the owner that he would bear this responsibility; the question is simply whether or not appellee did in fact do this.

When the railroad learned that the turpentine company wished to have a railroad siding, there was presumably a variety of arrangements whereby it could have satisfied the turpentine company's wishes. We may assume that some of these alternatives would have imposed the duty of maintenance on the railroad. However, the railroad chose to avoid this responsibility. It built the siding at the turpentine company's expense and had the turpentine company assume the responsibility of maintaining this siding—which it would own—in conformity with appellee's safety standards in order to make it possible for the railroad to send its cars upon this siding. At this juncture it was still possible for the railroad to assume the responsibility; for in discharge of its duty of repair and maintenance the turpentine company might either hire its own employees or it might ask the railroad to direct the latter's employees to do the necessary work. In the one case the railroad would be responsible for the employees' safety; in the other case the responsibility would rest upon the turpentine company.

■ Appellee contends that it managed to avoid the first alternative. Appellee's witnesses testified that the railroad had no duty to maintain this siding; that foreman Keene was requested by the president of the turpentine company and not by any railroad officer or employee to repair these tracks; and that the workers were all told they would be working for a third party and not for the railroad. It is undisputed that the third party paid the men's wages. Against this testimony which tends to show that the railroad never did assume the duty of maintenance, appellant is able to point to the railroad's book of operating rules and the circumstantial evidence—the customary use of appellee's employees and tools, etc.—which tended to show that as a matter of actual practice, the railroad did assume the duty.

As for the rule book, the jury was entitled to believe appellee's witnesses who said that the rule making the section foreman responsible "for the proper inspection and safety of tracks, bridges and trestles (including those privately owned), culverts and station grounds" within his section actually obligated him merely to inspect the private tracks and to report defects to their owners. The effect of all the circumstantial evidence has been discussed earlier in this opinion, and at this point we need only state virtually the same thing we stated there— that in effect the court's charge interpreted these facts as establishing that if the railroad had not expressly manifested its intent to the contrary, then it had assumed the duty of caring for the McKenzie siding and had employed appellant for the purpose of performing that duty.

We come, finally, to a consideration of the possibility that there was a duty imposed on appellee by law, regardless of its consent, to maintain these private sidings, and that either (1) this duty could not be delegated to independent contractors—not even the owners of the sidings—or (2) that if it did delegate it to a third party, the employees of that

other party would nevertheless be employees of appellee.

Appellant has cited no decisions extending a railroad's responsibility as far as this; nor have we found any in our own research. In Erie R. Co. v. Margue, supra, the duty to maintain the tracks arose out of the fact that "the maintenance of [the] defendant's railroad tracks was essential to the exercise of its franchise rights." 23 F.2d at page 665. However, we do not understand that every private siding upon which it sends its cars primarily for the use and benefit of the siding's owner is part of the railroad's franchise or that because of this the railroad is bound to keep it in repair. Nevertheless, even if there were somehow a duty on the railroad to maintain this trackage "in the exercise of its franchise rights," it is not certain that this duty would be nondelegable in the same way that the duty to maintain the railroad's main right of way would or might be. Compare Erie R. Co. v. Margue, supra, with Dougall v. Spokane, P. & S. Ry. Co., 9 Cir., 207 F.2d 843. However, we need not attempt to resolve this question here, since we are only dealing with a privately-owned siding on private property.

■ When we examine the cases decided by the Supreme Court we find that it has recognized the right of a carrier to avoid liability under the Act by delegating to independent contractors various functions which appear to be more integrally a part of the carrier's franchise or its general operations than the one with which we are presently dealing. Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849 upheld a contract of employment which made a porter in charge of a Pullman car an employee of the Pullman Company and not of the railroad. In Chicago, R. I. & Pac. R. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735, the Court recognized the right of a railroad to delegate the job of unloading and loading coal on the carrier's locomotives at one

of its terminals to an independent contractor. It was held that the contractor was not an employee of the railroad and therefore he was denied the benefits of the F.E.L.A. Cf. also Wells Fargo & Co. v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205. Similarly, in the present case, we hold that Atlantic Coast Line was not restrained by law from declining the responsibility of maintaining the McKenzie siding.

■ It is appellant's contention, however, that the maintenance of this siding was, in accordance with the recent decision in Sinkler v. Missouri Pac. R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed. 2d 799, a part of appellee's "total enterprise," and therefore he was an employee of appellee while he was participating in this aspect of the "common endeavor." In the Sinkler case the plaintiff was employed as a cook in the private car of the defendant railroad's general manager. He was at work in the car when a switching crew, employed by another railroad, undertook to switch the car from one track to another in the Union Station at Houston, Texas, and negligently jolted the car, injuring the plaintiff. The function of switching cars in the Houston area had been contracted to this other railroad by the defendant and all other carriers operating in that area. The question to be decided was whether the defendant was liable for the negligence of employees of this independent contractor. Interpreting Section 1 of the F.E.L.A., which makes carriers liable to their employees for injuries resulting from the negligence "of any of the officers, agents, or employees of such carrier," [19] a majority of the Court were of the opinion that the members of the switching crews were the defendant's "agents," and two Justices felt that they were performing nondelegable duties of the defendant railroad. The railroad was consequently held responsible for the injuries they negligently caused.

In passing upon the relevance of that decision to this case we must take into

19. 45 U.S.C.A. § 51.

account the distinction which the Supreme Court made in reaching it. First, the majority opinion made repeated references to the fact that the function which the independent contractor was performing was a "vital operational activity" [20] of the defendant's enterprise. The activity—the switching of all of the defendant's cars used in its regular operations in the Houston area—was a necessary and indispensable part of the defendant's regular operations; which contrasts with the incidental part which the turpentine company's private siding played in appellee's operations.

We need not rely upon this distinction, however, nor need we inquire whether a controlling distinction lies in the fact that, as the Supreme Court noted, the Sinkler case fell within the ambit of the common law doctrine that a carrier could not avoid its liability of respondeat superior by delegating to independent contractors its *operational* activities, or in the fact that Sinkler involved the issue of whether the negligent party was sufficiently closely connected to the carrier to incur liability whereas this case involves the question whether the injured party was so connected. It is sufficient to note that the majority of the Court expressly refrained from making any implication that the statutory terms "agents" and "employees" were coextensive or that the members of the ·crew employed by this independent third party were *employees* of the railroad. It limited its decision to the holding that they were "agents," within the majority's broad interpretation of that statutory term.[21] In so deciding, the Court apparently conceded the continuing validity of the rule of Robinson v. Baltimore & O. R. Co., supra, denying coverage to employees of carriers' independent contractors; for it distinguished that issue from the issue before it in the Sinkler case, without manifesting any inclination to discredit or disapprove of its decisions which disposed of the former issue adversely to employees.[22]

We therefore conclude that the Sinkler decision does not warrant an abandonment of the conclusion, which we reach on principle and authority, that either there was no duty on appellee to care for this private siding or if there was, it was a duty which appellee could lawfully delegate to others.

To sum up what we have said in the foregoing discussion, the trial court correctly refused to rule that appellant was injured in the course of employment for appellee, because the appellee's evidence raised an issue of fact on a point which was capable of outweighing all of the evidence pointing in appellant's favor, and because there was nothing which prevented or rendered illegal an agreement permitting a third party to assume responsibility for this maintenance and repair and to hire anyone, including appellee's regular employees, to discharge this task. Second, with the issue properly reduced to the factual question whether appellee had or had not hired appellant to do this work, the court committed no reversible error in refusing to submit this issue to the jury's consideration by charging them as to the criteria which are usually applied in determining which of two parties is a given individual's employer at a given moment.

We have carefully considered the appellant's other charges of error committed upon the trial and of abuse of discre-

---

20. 356 U.S. at pages 327, 328–329, 331, 78 S.Ct. at page 760.

21. The Court began its discussion of the law involved with this statement:
   "A railroad's liability under § 1 of the F.E.L.A. is to compensate its employees in damages for injuries resulting in whole or in part from the fault of 'any of the officers, agents, or employees' of such carrier. 45 U.S.C. § 51, 45 U.S.C.A. § 51.

No question of liability for the fault of officers or employees of the respondent is here raised, but only whether the petitioner's injuries were due to the fault of 'agents' of the respondent within the meaning of the section." 356 U.S. at page 328, 78 S.Ct. at page 761.

22. 356 U.S. at page 331 note 5, 78 S.Ct. at page 762.

tion in transferring venue, but we find no error nor anything which merits discussion in addition to what we have already said.

The judgment is affirmed.

RIVES, Circuit Judge (concurring in part and dissenting in part).

I concur in the ruling on the motion to dismiss the appeal and in that part of the opinion relating to said motion. I think, however, that the appellant was an employee of the Railroad, and that, in the maintenance and repair of the spur track or side track, the turpentine company was the "agent" of the Railroad within the meaning of the Federal Employers' Liability Act.[1]

Appellant was in the general employ of the Railroad. The services which he was performing at the time of his injury benefited the railroad as well as the turpentine company. In my opinion, the appellant did not cease to be a Railroad employee when he accepted work on the siding used in the operation of the Railroad. In the maintenance and repair of the siding, I think that the turpentine company was as truly the "agent" of the Railroad within the meaning of the Federal Employers' Liability Act as the Belt Railway was the "agent" of the Missouri-Pacific in switching the latter's car in Sinkler v. Missouri Pacific R. Co., 1958, 356 U.S. 326, 330, 78 S.Ct. 758, 2 L.Ed.2d 799.

In Robinson v. Baltimore & Ohio R. Co., 1915, 237 U.S. 84, 92, 35 S.Ct. 491, 59 L.Ed. 849, it was recognized that the contract by which liability was imposed solely on the Pullman Company would be invalid under Section 5 of the Act, now 45 U.S.C.A. § 55, if the employee of the Pullman Company were also the employee of the railroad company. Conceding arguendo that the appellant was the employee of the turpentine company, I think that he was also the employee of the Railroad Company. Further, the Pullman Company in that case and the connecting railroad in Linstead v. Chesapeake & Ohio Ry. Co., 1928, 276 U.S. 28,

48 S.Ct. 241, 72 L.Ed. 453, were not considered as "agents" of the defendant railroad, as I think the turpentine company should be under the meaning of "agent" developed in the Sinkler case, supra.

I therefore concur in part and dissent in part.

CAMERON, Circuit Judge (concurring).

I concur in the affirmance of the judgment of the district court and in all which was so ably said by Judge Tuttle in concluding that the court below did not commit error in entering final judgment on the merits against appellant and in favor of appellee.

I am not in accord with the portion of the opinion which holds that the appeal was timely. Since the judgment affirmed is a final disposition of the case, I think that the ruling with respect to the appeal is of no practical moment, and have noted my views thereon only to avoid the inference that I would be bound by what it said in the opinion concerning the timeliness of the appeal.

---

1. I do not mean to intimate that the cost of such maintenance and repair could not

by contract be imposed on the turpentine company. That question is not before us.