George OKOLINSKY

v.

### PHILADELPHIA BETHLEHEM & NEW ENGLAND RAILROAD COMPANY.

Civ. A. No. 18367.

United States District Court
E. D. Pennsylvania.

Dec. 15, 1959.

Donald J. Farage, Philadelphia, for plaintiff.

Philip Price, Philadelphia, for defendant.

GRIM, District Judge.

George Okolinsky, seriously injured while at work on the premises of the defendant railroad, brought this action against it under the Safety Appliance Act, 45 U.S.C.A. §§ 1–23, and the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. At a pretrial conference it was agreed that the issues of employment and liability should be served and that the question of employment should be tried by the court without a jury, prior to trial on the question of liability. A trial has been held on the employment issue, and requests for findings of fact and conclusions of law thereon are now before the court.

The Philadelphia, Bethlehem & New England Railroad lies entirely within the City of Bethlehem, Pennsylvania. It connects with the lines of the Reading, the Lehigh Valley, and the Central Railroad of New Jersey, and serves the plants of the Bethlehem Steel Company and other industries. It now has 63 miles of track.

In 1951 the railroad began the construction of a new yard, the Iron Hill yard, which was to add 13 miles of new track to its then total of 50 miles. Most of the work on the Iron Hill yard was done by contractors the railroad engaged. There were contracts for earth removal, grading, building construction, bridge construction, and the like. The contract for laying the track was let to T. F. Scholes, Inc., on the basis of the railroad's drawing and specifications, modified after preliminary negotiations between the parties.

In the course of laying the track under its contract with the railroad, Scholes hired George Okolinsky, the plaintiff, as a laborer. Plaintiff's classification was changed later from laborer to truck driver. He drove a Scholes truck, sometimes in and sometimes outside the Iron Hill yard. At other times, still classified as a truck driver, he worked in the yard with Scholes' crane operator unloading rails from a railroad car at places where they were needed for track laying. At all times he was paid by Scholes, was on the Scholes payroll, was, like other similar Scholes employees, a member of the Teamsters' union and not a union of the defendant's employees, and had nothing deducted from his pay for railroad retirement benefits.

In June of 1953, some eight months after he had been hired, plaintiff was working with the Scholes crane operator, Willison. Willison ordered him to get on a moving railroad car, loaded with rail, and stop it by applying the car's brake. The car had been put in motion by the Scholes crane, operated by Willison, in the course of distributing rail at places where it was to be laid. Plaintiff fell off the car and under it. The wheels ran over both his legs and severed them.

Whether or not, under the circumstances of each case, an injured person is an employee of a railroad is a mixed question of law and fact: Baker v. Texas & Pacific Railway Co., 1959, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756; Byrne v. Pennsylvania Railroad Co., 3 Cir., 1958, 262 F.2d 906. "The test of who has the 'right to control' the activities of the workman is the generally accepted criterion determining employment status." Byrne v. Pennsylvania Railroad Co., supra, at page 912.

The specifications, covering 13 typewritten pages, deal with a multitude of details, including such minute matters as the spacing of ties and methods of bending and cutting rail. Plaintiff argues that the specifications govern so many details of the work that they deprive the contractor of the right to control the manner in which the work was to be done—the "how" of the work—and that they place the right to control in the hands of the railroad, thereby constituting the railroad the employer both of the contractor and of plaintiff within the meaning of the word as it is used in the F.E.L.A. and the Safety Appliance Act.

That the specifications governed infinitesimal details of methods the contractor was to follow in doing the work is perfectly clear. In determining whether the specifications constitute the railroad the employer of the contractor's employees, however, it must be ascertained whether or not the railroad has the right, under the specifications, to control the details of the way the contractor's employees are to perform their tasks while the work is going on. The specifications are pertinent, therefore, only in so far as they deal with the railroad's right to exercise control of the manner in which the contractor's employees do their tasks while the work is being done.

In support of his contentions, plaintiff cites in his brief innumerable provisions of the specifications which prescribe many details of methods to be used by the contractor in laying the track and the order in which various segments of the track-laying operation are to be worked on. He terms them "how" and "when" provisions. Among the provisions he cites are these typical examples:

"Ties

"(a) Shall be laid with heart side down.

"(b) Shall be spaced with an average of twenty-four inches center to center.

"(c) Shall be laid at right angles to center-line * * * as may be directed by Engineer.

"(d) Shall be so handled as to avoid mechanical damage by picks * * *

"(e) Shall have any holes * * * plugged with treated wooden tie plugs supplied by Railroad."

"Preliminary surfacing shall follow ballast unloading. * * * Both rails shall be raised at the same time * * *"

"8. When track has been raised to within two (2) inches of final construction grade and properly compacted, a finishing lift shall be made * * *"

"* * * Scrap shall be loaded in cars or in vehicles by Contractor when directed by Engineer * * *"

The "how" provisions cited deal only with the manner in which the contractor is to do the work and relate to the quality of the work which the railroad desires. Provisions with respect to avoiding damage and plugging holes are of importance in setting a degree of care with which the work is to be done. The "how" in each of these provisions has to do solely with the result expected from the contractor's work, and has nothing to do with the manner in which the contractor's employees are to perform their tasks.

The first two "when" provisions cited deal with the order in which certain track-laying procedures are to be done. The third "when" provision requires the contractor to load scrap when the railroad directs. These three provisions likewise have nothing to do with the way in which the contractor's employees are to perform their tasks.

Plaintiff cities other provisions of the specifications which provide for full or partial completion of various parts of the yard at different times, so that track might be available for the railroad to run over, or so that yard construction would dovetail with the work being done by other contractors. While provisions of this sort give a railroad control over the time when work is to be done, they still do not give it control over the time when a particular employee of a contractor is to do a particular task.

Other provisions of the specifications provide that the railroad is to furnish all materials used in track construction and is to have the right to increase or decrease the quantity of track to be laid. These matters apply with force only to the contractor and not to its individual workmen.

Another provision of the specifications reads:

"These Specifications cover furnishing [by the contractor] of all necessary supervision, tools, equipment and labor * * *"

This provision, by requiring the contractor to furnish supervision, takes away rather than confers on the railroad the power to control the contractor's employees.

No provision of the specifications empowers the railroad to come in and direct any workman of the contractor as to what work he is to do at any particular time, or how he is to do it, or to direct him to stop this work and do something else, or to direct him to do work at a different place, or when to report for work and when to quit, or to take a day or a week off, or to discharge him. Even though under the specifications the railroad has the right to have incompetent employees taken off work they could not handle, the specifications give the railroad no right to control the activities of the contractor's employees and lend no support to plaintiff's contention that they do.

■ "If the contract language is contrary to the true relationship between [the contractor] and the railroad it of course does not govern," Del Vecchio v. Pennsylvania Railroad Co., 3 Cir., 1956, 233 F.2d 2, 4. Plaintiff contends that this principle applies and relies on certain happenings during the construction of the Iron Hill yard to establish his contention that the railroad in fact not only had the right to control the activities of Scholes workmen, but that it exercised that right, and that this exercise of control shows the true relationship between the railroad and the contractor.

When plaintiff suffered his injury, the Scholes organization had been at work on the Iron Hill yard for about a year. During all that time Scholes' workmen were taught, directed, and controlled by foremen and other supervisory personnel of the Scholes organization, to the exclusion of railroad personnel. Plaintiff established that during that time there were some four or five instances in which Scholes made a crane and a few employees available to the railroad. They were made available to the railroad to lift levers for a railroad track scale, to move a track so that the railroad could maintain service to one of its customers, to unload wire fence, and to lift a track covered up by a small slide of earth. The duration of each of these small jobs was a matter of a few hours at the most.

■■ The value of the small jobs and the amount of time required for them were both so insignificant in comparison with Scholes' entire track-laying project, that even if on these small jobs the railroad did give orders directly to Scholes' workmen as to how the work was to be done, that would not establish plaintiff's case. The mere fact that the injured person may have received directions from the railroad with respect to some aspects of his work will not constitute him a railroad employee: Docheney v. Pennsylvania Railroad Co., 3 Cir., 1932, 60 F.2d 808. Comparing the orders given by the railroad directly to Scholes' workmen on these small jobs with the many aspects of the track-laying project on which the railroad did not give direct orders to them, it is clear that no right to control can be found.[1]

Plaintiff produced testimony tending to show that on some of these small jobs railroad personnel gave orders or instructions to plaintiff and other Scholes employees. This evidence was not precise,[2] and since one or more of the Scholes supervisors or foremen was always present, it cannot be said definitely whether the instructions or orders were given to the supervisors or foremen as suggestions or directly to the workmen as orders. Much of this evidence was

---

1. See Restatement, Agency, 2d, Sec. 220, comment c: " * * * It is for the triers of fact to determine whether or not there is sufficient group of favorable factors to establish the relation."

2. E. g. "He used to come around a lot of times, give me all different orders."

denied by defendant's witnesses. The testimony on this subject is uncertain to a degree because it frequently involves the use of the word "instructions",[3] an ambiguous term capable of meaning either "commands" or "teachings." For this reason much of the evidence on this point is so ambiguous as to be of little value, and no finding of fact can be made to the effect that even on these small jobs the railroad gave orders as to the manner in which Scholes employees were to do their work.

It is noteworthy that the injury to plaintiff occurred while he was doing track work for Scholes, and not while he was on one of the small jobs for the railroad. Plaintiff, moreover, was not the skilled operator of the crane, typical of "loaned employee" cases, but acted as a "hooker", fastening loads to the crane's tackle and unfastening them.

Plaintiff has laid stress on the fact that from time to time the railroad exercised control by directing Scholes supervisors when and where track work was to be done and by having work stopped at one place and begun at another. On two or three occasions the railroad's field engineer, Church, told Scholes supervisors that the railroad wanted certain parts of the Iron Hill yard completed, to fit in with work being done by other contractors or by the Reading Railroad. Scholes complied. These directions had to do with the time and place where portions of the work were to be done and did not constitute control of the manner of doing the work. This is similar to the situation of a man who engages a contractor to build him a house and a garage, and for the sake of personal convenience has the contractor finish one structure before the other. This degree of control is not so pervading as to reduce the contractor to the status of an employee. See Vaughan v. Warner, 3 Cir., 1946, 157 F.2d 26, which held that the power of a theatre owner to vary the duration of a vaudeville act and the time during the program when it was to be performed did not constitute the performer an employee of the owner.

 There is no evidence that the purpose or intent of the defendant railroad was to exempt itself from the F.E.L.A. Hence Section 5 of the Act, 45 U.S.C.A. § 55, having to do with evasion, does not apply.

I find that plaintiff was not an employee of the defendant railroad. Detailed findings of fact and conclusions of law are filed herewith.

---

3. E. g. "Q. Now, you did get orders from other railroad people from time to time, did you not? A. Never direct orders—maybe instructions after conferences.

"Q. I say, they would give you instructions—not conferences—instructions."